**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

DUNKIN' DONUTS FRANCHISED
RESTAURANTS, LLC, DD IP HOLDER, LLC     Civil Action No. 12-cv-2010
BASKIN-ROBBINS FRANCHISED
RESTAURANTS, LLC and DB REAL ESTATE
ASSETS I, LLC,

Plaintiffs,

v.

CLAUDIA I, LLC, MANFRED P. MAROTTA
And LYNNE K. MAROTTA,
Defendants.

CLAUDIA I, LLC, MANFRED P. MAROTTA
And LYNNE K. MAROTTA,

Marottas

v.

SPRING HILL REALTY, INC.
THIRD DUNKIN DONUTS REALTY, INC.

Third Party Defendants

DEFENDANTS' THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES,
COUNTERCLAIM AND
THIRD PARTY AMENDED COMPLAINT

The Defendants, Claudia I, LLC, Manfred Marotta and Lynne Marotta (collectively the "Defendants"), by and through their counsel, the Hamilton Law Firm PC, answer the allegations set forth in the Plaintiffs' Amended Complaint and make the following Counterclaim as follows:

PARTIES

1. The Defendants, in reliance upon the Plaintiff's averments, admit the allegations set forth in paragraph 1 of the Amended Complaint.

2. The Defendants, in reliance upon the Plaintiff's averments, admit the allegations set forth in paragraph 2 of the Amended Complaint.

1

3.      The Defendants, in reliance upon the Plaintiff's averments, admit the allegations set forth in paragraph 3 of the Amended Complaint.

4.      The Defendants admit the allegations set forth in paragraph 4 of the Amended Complaint except to say that DB Real Estate Assets I, LLC has assigned its rights under the lease with the prime landlord, Spring Hill Realty, LLC, to the Defendants.

5.      The Defendants admit the allegations set forth in paragraph 5 of the Amended Complaint except to say that it is an assignee of the rights and obligations of the Plaintiffs under the prime lease with Spring Hill Realty, Inc.

6.      The Defendants admit the allegations set forth in paragraph 6 of the Amended Complaint except to say that they are guarantors under the assignment of the prime lease to Claudia I, LLC.

### VENUE AND JURISDICTION

7.      The Defendants are not required to admit or deny the statement contained in paragraph 7 of the Amended Complaint as it is a legal assertion.

8.      The Defendants admit the allegations set forth in paragraph 8 of the Amended Complaint.

9.      The Defendants admit that they are residents of the Commonwealth of Pennsylvania and conduct business in Pennsylvania.

### The Parties Rights and Obligations Under the Franchise Agreement

10.     The Defendants admit that Claudia I, LLC entered into a Franchise Agreement with the Plaintiffs to operate the Dunkin Donuts store located at 505 Old York Road, Jenkintown, PA.

11.     The Defendants admit that pursuant to the Franchise Agreement, they agreed to operate the Plaintiff's trade names and system.

12.     The Defendants admit the allegations set forth in paragraph 12 of the Amended Complaint.

13.     The Defendants admit the allegations set forth in paragraph 13 of the Amended Complaint.

14.     The Defendants admit that they are bound by certain reporting obligations contained in the Franchise Agreement and state that Dunkin is also bound by certain representations and obligations under same Franchise Agreement.

15.     The Defendants admit that the Franchise Agreement contains obligations and
        representations by both parties relating to the use of the Plaintiffs' proprietary
        marks or methods.  The Franchise Agreement also contains certain
        representations and obligations made by Dunkin with respect to the support and
        guidance provided to franchisees.

16.     The Defendants admit that the language quoted in paragraph 16 is contained in
        the Franchise Agreement.  The Franchise Agreement also contains language
        regarding the representations and obligations related to Dunkin's skill and
        expertise in the business.

17.     The Defendants deny the allegations contained in paragraph 17 of the Amended
        Complaint.

<u>Defendants' alleged Defaults</u>

18.     The Defendants deny that the Plaintiffs are due the monies claiming to be owed
        and further that the declaration of default is valid and enforceable.  The
        Franchisor has received and continues to receive all franchise fees due to it
        under the Franchise Agreement and accordingly, the Defendants may properly
        continue to use the brands and systems authorized under the Franchise
        Agreement.

19.     The Defendants admit that all Defendants have guaranteed the obligations but
        deny that they are in default.

20.     The Defendants deny the allegations contained in paragraph 20 of the Amended
        Complaint.

21.     The Defendants admit that they have been provided with a document which
        Plaintiffs' purport to be a valid notice of termination of the Franchise Agreement.

22.     The Defendants admit that the Plaintiffs believe that the notice of termination
        was based upon their alleged default.  The Defendants deny that they are in
        monetary default under the Franchise Agreement.

23.     The Defendants deny the allegations set forth in paragraph 23 of the Amended
        Complaint.

24.     The Defendants deny that they owe any damages whatsoever to the Plaintiffs or
        that they are in breach of the Franchise Agreement.

25.     The Defendants deny that they owe royalties, advertising fees and damages for
        post-termination operations.

<u>COUNT I</u>
(Alleged Breach of Franchise Agreement and Sublease)

26.     The Defendants deny the allegations set forth in paragraph 26 of the Amended Complaint and incorporate their responses to paragraphs 1 through 25 as though recited herein verbatim and at length.  The Defendants deny that they are in default of the Franchise Agreement.

27.     The Defendants deny that the Plaintiffs have incurred or are likely to incur any damages whatsoever.

28.     The Defendants deny the allegations set forth in paragraph 28 of the Amended Complaint.

<u>COUNT II</u>
(Trademark Infringement)

29.     The Defendants incorporate their responses to the allegations set forth in paragraphs 1 through 28 of the Amended Complaint as though recited herein verbatim and at length.

30.     The Defendants deny that the Franchise Agreement has been validly terminated.

31.     The Defendants deny the allegations contained in paragraph 31 of the Amended Complaint.

32.     The Defendants deny the allegations set forth in paragraph 32 of the Amended Complaint.

33.     The Defendants deny that the Plaintiffs have suffered any damages whatsoever.

<u>COUNT III</u>
(Unfair Competition)

34.     The Defendants incorporate their responses to the allegations set forth in paragraphs 1 through 33 of the Amended Complaint as though recited herein verbatim and at length.

35.     The Defendants deny the allegations set forth in paragraph 35 of the Amended Complaint.

36.     The Defendants deny the allegations set forth in paragraph 36 of the Amended Complaint.

37.     The Defendants deny the allegations set forth in paragraph 37 of the Amended Complaint.

<u>COUNT IV</u>
(Enforcement of Restrictive Covenant)

38.     The Defendants incorporate their responses to the allegations contained in paragraphs 1 through 37 of the Amended Complaint as though recited herein verbatim and at length.

39.     The Defendants admits that the language cited in paragraph 39 is contained in the Franchise Agreement.  The Defendants also state that the Franchise Agreement has language relating to the representations and obligations made by Dunkin to induce the Franchisee into paying franchise fees and entering into this business.

40.     The Defendants deny the allegations set forth in paragraph 40 of the Amended Complaint.

WHEREFORE, the Defendants seek the following relief against the Plaintiffs:

a.  An Order of this Court dismissing the Amended Complaint in its entirety;
b.  An Order compelling the Plaintiffs to pay counsel fees and costs of suit incurred by the Defendants in this action; and
c.  For such other relief that this Court deems just and equitable under the circumstances.

**Defendants' Affirmative Defenses**

1.      The Plaintiffs' Amended Complaint must be dismissed in its entirety for failure to state a cognizable cause of action against the Defendants.

2.      The Plaintiffs' Amended Complaint must be dismissed in its entirety for lack of personal and subject matter jurisdiction.

3.      The Plaintiffs' Amended Complaint must be dismissed in its entirety because the Plaintiffs' are legally estopped from bringing these claims against the Defendants.

4.      The Plaintiffs' Amended Complaint must be dismissed in its entirety because the Plaintiffs' are equitably estopped from bringing these claims against the Defendants.

5.      The Plaintiffs' Amended Complaint must be dismissed in its entirety for their failure to exhaust all contractual remedies before resorting to litigation.

6.      The Plaintiff's Amended Complaint must be dismissed in its entirety because the Plaintiffs' have acted in bad faith.

7.      The Plaintiffs' Amended Complaint must be dismissed in its entirety because the Plaintiffs' come to this Court with unclean hands.

8.      The Plaintiffs' Amended Complaint must be dismissed in its entirety because the Plaintiffs' have tortiously interfered with the Defendants reasonable ability to perform their obligations under the Franchise Agreement.

9.      The Plaintiffs' Amended Complaint must be dismissed in its entirety as being unconscionable.

10.     The Plaintiffs' Amended Complaint must be dismissed in its entirety as all damages claimed by the Plaintiffs' as being allegedly due were caused by their own actions.

11.     The Plaintiffs' Amended Complaint must be dismissed in its entirety as the Plaintiffs' have failed to mitigate their damages.

12.     The Plaintiffs' Amended Complaint must be dismissed in its entirety because of the Plaintiffs' own negligence and intentional actions and fraud in this matter.

13.     The Plaintiffs' Amended Complaint must be dismissed in its entirety based upon the doctrine of laches.

14.     The Plaintiffs' Amended Complaint must be dismissed in its entirety because their own actions have made it impossible for the Defendants' to perform the obligations under the Franchise Agreement.

15.     The Plaintiffs' Amended Complaint must be dismissed in its entirety because of the statute of frauds.

## COUNTERCLAIM AND THIRD PARTY AMENDED COMPLAINT
## (DUNKIN AND SPRING HILL)

Claudia I, LLC, Manfred Marotta and Lynne Marotta (hereinafter, "Counterclaimants" or "Marottas" or the "Marottas") raise the following Counterclaims against all of the Plaintiffs ("Dunkin") and the following Third Party Amended Complaint against Spring Hill Realty, Inc. ("Spring Hill") and Third Dunkin' Donuts Realty, Inc. ("TDDR"):

1.      The Marottas re-iterate the averments of fact and their responses to the Dunkin's allegations contained in the Amended Complaint as though recited herein verbatim and at length

2.      The Marottas entered into a Franchise Agreement with Dunkin whereby they were granted the license to operate three "Dunkin Donuts" stores (the "Stores") in the Commonwealth of Pennsylvania.

3.      The Store, which is the subject to this litigation, is located at 505 Old York Road, Jenkintown, PA (the "Jenkintown Store") and is operated by the Marottas.

4.      The Marottas have operated this Store since July 2009, when they were assigned the Franchise Agreement with Dunkin's consent.

5.      The Jenkintown Store is operated at a location where the prime landlord is Spring Hill Realty, Inc. ("Spring Hill"), maintaining its principal place of business at 528 Main Street, Suite 200, Harleysville, Montgomery County, Pennsylvania.

6.      TDDR entered into a lease with Spring Hill, which lease is currently being re-negotiated as the current lease expires in January 2013. ("Prime Lease")

7.      TDDR maintains a principal place of business at 14 Pacella Park Drive, Randolph, MA 02368 and, in Article 18 of the Prime Lease, has designated that address as being the address where it will accept service of all notices.

8.      TDDR has entered into a sublease with the Marottas, which sublease expires in 2022.   ("Dunkin Lease")

9.      The Marottas are not directly named parties to the Prime Lease.

10.     However, the Marottas are the intended third party beneficiaries of the Prime Lease.

11.     Further, the Marottas have been assigned TDDR's right and obligations under the Prime Lease in the Dunkin Lease.

12.     By virtue of the assignment, the Marottas stand in TDDR's shoes in the Prime Lease.

13.     The Prime Lease, in Article 1.1(o) defines the Permitted Use as being the "operation of a quick service restaurant (for both on and off premises consumption) consisting of three (3) distinct trademarks for the manufacture and sale of products typically sold in Dunkin' Donuts, Baskin Robbins, and Togo's locations."

14.     Neither Dunkin nor TDDR maintain any corporate run stores where they sell any products under the Dunkin Donuts, Baskin Robbins or TOGO's brands or trademarks.

15.    Dunkin's Franchise Disclosure Document, at pg. 1, states that it does not maintain any corporate run stores which manufacture or sell any products under the Dunkin' Donuts, Baskin Robbins, and Togo's brands and that they "do not conduct any business activity other than franchising Dunkin' Donuts stores."

16.    In Article 11 of the Prime Lease, Spring Hill has consented to the assignment and/or subletting of the Premises by TDDR to a franchisee.

17.    Spring Hill has provided a blanket approval for the assignment or subletting of the Prime Lease to the entities or individuals identified in paragraph 11.1 of the Prime Lease.

18.    Article 11 of the Prime Lease, paragraph 11.1, specifically provides TDDR the right to assign or sublet the Prime Lease to any of its subsidiaries or any of its "corporate qualified franchisee that has met the standards for franchise operation."

19.    The Marottas are a "corporate qualified franchisee that has met the standards for franchise operation" as per the definition contained in the Prime Lease.

20.    As third party beneficiaries, the Marottas have standing to seek damages for fraud and conspiracy being committed by the collusion of Spring Hill and Dunkin that has a direct detrimental effect upon the Marottas.

21.    As third party beneficiaries of the Prime Lease, the Marottas have privity to seek enforcement of the Prime Lease and to seek damages for Spring Hill and Dunkin's breach of their obligations under that Lease.

22.    As the intended third party beneficiary identified in Paragraph 11.1 of the Prime Lease, the terms of which are specifically referenced and incorporated into the Dunkin Lease, the Marottas have standing to seek enforcement of the Prime Lease.

23.    The Marottas have attempted to compel Spring Hill to comply with the terms of Article 17.4 of the Prime Lease.

24.    Spring Hill has refused and continues to refuse to comply with Article 17.4 of the Prime Lease.

25.    The square footage representations contained in Paragraph 1.1(p) of the Prime Lease are specifically incorporated into the Dunkin Lease at Paragraph 1.6.

26.    The misrepresentation regarding the actual square footage occupied by the Marottas relates to a material term of the Dunkin and Prime Leases.

8

27.     The amount of square footage being leased by the Plaintiff and Marottas has a direct impact on the amount of Common Area Maintenance ("CAM") that the Marottas are required to pay.

28.     TDDR's and Spring Hill's misrepresentation regarding the amount of square footage actually occupied by the Marottas has resulted in the Marottas being required to pay a larger share of the CAM charge that would be required if the square footage were properly stated.

The Prime Lease

29.     The Prime Lease, Article 1.1(d), defines the common areas as "parking areas, access roads, sidewalks, and landscaping in the shopping Center intended for the non-exclusive, general use of tenants, other occupants of the Shopping Center and the general public."

30.     The Prime Lease, Article 1.1(h), defines the Landlord's floor area as the "aggregate amount of square feet of *leasable floor area* in the Shopping Center, and is currently 29,384 square feet."

31.      Article 7.2(a) of the Prime Lease provides that the tenant shall reimburse the landlord for its pro-rata share of "real property taxes assessed on the tax parcel on which the Premises are located."

32.     Article 7.2(b) of the Prime Lease provides that the tenant's pro-rata share shall be based upon the amount of square footage of the Premises.

33.     Article 1.1(p) of the Prime Lease defines Premises as "that portion of the Landlord's building designated "Premises" on the site plan attached to Exhibit A, in the configuration shown on the Site Plan, and with square footage as follows:

|               |                    |
|---------------|--------------------|
| Ground Floor: | 3,100 square feet  |
| Basement:     | 1,500 square feet  |
| Second Floor: | 484 square feet"   |

34.     According to the Prime Lease, the Marottas occupy 5084 square feet.

35.     Article 17.1 provides that the Landlord shall be responsible for maintenance of common areas.

36.     In defining the tenant's pro-rata share of the CAM charges, Article 17.2(a) of the Prime Lease provides that "the tenant shall reimburse Landlord for Tenant's pro-rata share of the costs and expenses necessary for the maintenance and operation of the Common Area of the Shopping Center[.]"

37.     Article 17.2(b) provides that CAM expenses shall not include any capital expenditures as defined by the IRS code.

38.     The tenant's pro-rata share of the CAM expense is calculated based upon the square footage actually possessed by the tenant.

39.     Article 17.4 provides that a tenant may conduct a square footage audit at its own cost.

40.     Article 17.4 specifically provides that where "the Common Area Maintenance Expenses are found to be overstated by 5% or more, and as a result Tenant has over paid for Tenant's pro rata share of such expenses by more than fifteen hundred Dollars ($1500), Landlord shall bear the cost of such inspection, excluding the cost of travel and lodging.  Landlord shall promptly refund to Tenant any overpayment[.]"

41.     The CAM overpayments made by the Marottas far exceed the sum of $1500.

42.     Spring Hill has been charging Capital Expenditures as CAM expenses.

43.     These improper CAM expenses have been charged to the tenants.

44.     Spring Hill has charged improper business operation taxes to the tenants.

45.     Demand for reimbursement has been made on several occasions to no avail.

46.     Spring Hill has refused to provide any details or documentation regarding the expenditures being charged as CAM.

<u>The Dunkin Lease</u>

47.     The Marottas executed a document that Dunkin/TDDR calls a "sublease" for the Jenkintown Store.

48.     The document between TDDR and Claudia I, LLC, is called a "AD QSR Lease of Dunkin' Donuts/Baskin Robbins" (the "Dunkin Lease").

49.     The Dunkin Lease references and incorporates the terms of the Prime Lease.

50.     The Dunkin Lease further requires that any claims that the Marottas may have against the Prime Landlord, Spring Hill Realty, must be raised directly with Spring Hill.

51.     The Marottas have attempted to raise these issues directly with Spring Hill to no avail.

52. The Marottas have also raised these issues with Dunkin to no avail.

53. Spring Hill has refused to take any action on the square footage discrepancy claiming that the Marottas don't have standing to seek enforcement of Paragraph 17.4 of the Prime Lease.

54. Spring Hill states that TDDR is the only party entitled to seek enforcement of the terms of the Prime Lease.

55. Marottas have asked TDDR to seek enforcement of Paragraph 17.4 against Spring Hill for improper CAM charges and overpayment of CAM charges based upon the incorrectly stated square footage.

56. TDDR and Dunkin have refused.

57. Article 14 of the Dunkin Lease further provides that termination of the Franchise Agreement will also result in termination of the Lease.

Square Footage Audit

58. In late 2010, during a discussion with Dunkin's Operation Management and Construction Management team, the Marottas realized that there might be some issue regarding the square footage calculations represented in the Prime Lease and the Dunkin Lease.

59. The Third Party Defendants ordered and received a completed square footage audit in February 2011 that confirmed that the actual square footage of the lease premises was overstated and the actual square footage of the shopping center square footage was understated.

60. The Third Party Defendants presented the square footage audit to both Spring Hill and Dunkin in August 2011.

61. The audit revealed that the Landlords (both Dunkin and Spring Hill) had *understated* the total square footage of the shopping center.

62. The total square footage of the shopping center is stated to be 29, 384 in the Prime Lease but the rent roll prepared by Spring Hill Realty shows a total square footage of 30,094.

63. The audit also revealed that the Landlords (both Dunkin and Spring Hill) had *overstated* the square footage actually occupied by the Marottas.

64. The Lease shows that the Marottas are occupying 3167 square feet on the first floor.

65.    The Marottas retained a surveyor who measured the leased premises' square footage to be 2782.6 for the first floor only.

66.    The difference in square footage is 384.4 square feet, which represents more than a 10% difference.

67.    Spring Hill and Dunkin state that the square footage is to be calculated from the outside walls of the leased premises.

68.    Article 1.1(h) of the Prime Lease defines the "Landlord's Floor Area" as being the "aggregate amount of square feet of leasable floor area in the Shopping Center" and the usual and customary definition of which requires the calculation of square footage from the internal walls.

69.    The effect of these misrepresentations is that the Marottas have been charged a larger pro-rata share of the CAM expense that they should be required to pay.

70.    The Marottas have been paying this larger share without refund since July 2009.

71.    The Marottas have also been forced to pay a pro-rata share of several improper CAM expenditures.

72.    The Marottas have also been forced to pay for various business operation taxes charged to Spring Hill that are not properly chargeable to the tenants under either the Prime Lease or Dunkin Lease.

73.    The Marottas' auditor also raised several other issues relating to CAM expenses that should not have been properly charged to the tenants as a CAM expense. For instance,
       a.  Tenants are improperly being charged for trash/dumpster removal;
       b.  Repairs to glass/new fire door should have been a landlord expense;
       c.  Tenants are only responsible for real estate taxes and should not have been charged a business privilege tax.

74.    In addition, in a letter dated August 22, 2011, the auditor also identified several other areas where Spring Hill had failed to provide appropriate documentary back up for charges being assessed against the Tenants.

75.    The Counterclaimant forwarded the Audit to Spring Hill and Dunkin's leasing department but heard nothing for many months.

76.    Spring Hill refused to deal with any of the issues and has refused to correct the square footage overstatement.

77.    TDDR and Dunkin also refused to respond or discuss the issue despite the Marottas' numerous requests.

78. TDDR, Dunkin and Spring Hill have not refunded any amounts to the Marottas for overpayments made on CAM.

79. In early 2012, TDDR/Dunkin's leasing department advised the Marottas that they were in the midst of lease re-negotiations with the Prime Landlord, Spring Hill.

80. The Marottas, independently and through their attorney, repeatedly asked Dunkin if they could participate in the lease re-negotiations.

81. The Marottas, independently and through their attorney, repeatedly provided Dunkin with valuable information to assist in the lease re-negotiations.

82. The information consisted of the square footage audit report, details of inappropriate CAM charges being assessed, proof that other comparable commercial premises within the Jenkintown area were being offered at $18-22 per square foot, and proof that Spring Hill itself was advertising its own price per square foot for the same shopping center as $18-22 per square foot.

83. Currently, the Lease requires that Dunkin and the Marottas pay $36 per square foot for rent and an overstated CAM percentage.

84. As demonstrated by the Marottas, $36 per square foot for this location and type of commercial space far exceeds the fair market price.

85. In fact, online/internet research revealed that Spring Hill is leasing space in this same shopping center for $18 to $22 per square foot.

86. The Marottas have provided copies of the rental listings and advertisements to TDDR/Dunkin.

87. The Marottas have also provided listings for comparable commercial locations within the same geographical location to Dunkin.

88. Yet, Dunkin has refused to re-negotiate a lower price for the rent or raise any of these issues with Spring Hill.

89. Instead, Dunkin has presented the Marottas with a Lease Modification Addendum that requires the Marottas to waive all of their claims against Spring Hill for CAM over payments.

90. Dunkin/TDDR has no legitimate business justification for refusing to negotiate a new lease with the correct square footage reflected therein.

91.   Dunkin/TDDR has no legitimate business justification for refusing to negotiate a new lease at fair market rent as is currently being advertised by Spring Hill.

92.   Dunkin/TDDR has no legitimate business justification for refusing to negotiate a new lease with a new landlord for a new location when such locations exist and the Marottas have agreed to incur the cost of the fit out of such new location.

93.   The Marottas have also provided copies of the audit showing that they are being over charged for CAM expenses and that there are numerous CAM expenses that the Prime Landlord should not be assessing to the Tenants.

94.   Spring Hill has refused to re-calculate and reimburse to the Marottas' overpayments of the pro rata CAM expense despite proof that the square footage being used in the calculations is incorrect.

95.   Dunkin/TDDR has refused to take any steps to re-negotiate the lease to make sure that the CAM percentage is corrected, to ensure that the square footage is accurately reflected, or to make sure that they are getting a fair market value for rent.

96.   Dunkin/TDDR appear to have aligned themselves with the Prime Landlord, Spring Hill, rather than its own franchisee.

97.   Dunkin/TDDR have no business justification for aligning themselves with the Prime Landlord against their own franchisee.

98.   Dunkin/TDDR are permitting Spring Hill to steal from the Marottas.

99.   Dunkin/TDDR has no business justification for permitting the Prime Landlord/Spring Hill to steal from the Marottas.

100.  Dunkin/TDDR have colluded with Spring Hill to harm the Marottas in refusing to compel Spring Hill to correctly state the square footage, re-fund excess CAM already paid by the Marottas as expressly required by the terms of the Lease, and by refusing to ensure that the Marottas are provided with a Lease which accurately reflects the fair market value rental for this location.

101.  Dunkin/TDDR have no legitimate business justification for colluding with Spring Hill against the Marottas.

102.  The Marottas have been harmed and continue to suffer harm as a direct and proximate result of Dunkin/TDDR's and Spring Hill's actions and collusion.

COUNTERCLAIM/THIRD PARTY AMENDED COMPLAINT-COUNT I
(DUNKIN, TDDR and SPRING HILL)
(Fraud)

103.    The Marottas reiterate the averments of fact set forth in paragraphs 1 through 102 of the Counterclaim/Third Party Amended Complaint as though recited herein verbatim and at length.

104.    Spring Hill Realty, Inc. is named as the Third Party Defendant and maintains its principal place of business at 528 Main Street, Suite 200, Harleysville, Montgomery County, in the Commonwealth of Pennsylvania.

105.    Leo Orloski is named as the president and treasurer of Spring Hill Realty, Inc.

106.    Brian Husberger is named as the secretary and vice president of Spring Hill Realty, Inc.

107.    Spring Hill Realty ("Spring Hill") is the prime landlord that has leased a portion of its shopping center located at 505 Old York Road, Jenkintown, PA to Third Dunkin Realty, Inc.  ("TDDR") that has leased it to the Marottas.

108.    TDDR is a domestic profit corporation registered to do business in Massachusetts and maintains a principal place of business at 14 Pacella Park Drive, Randolph MA 02368.  This is also the address listed in the Prime Lease as being the location where notices and service of process will be accepted.

109.    Jon Luther is the president of TDDR.

110.    Jennie Wilson is the vice treasurer of TDDR and signed the Prime Lease as vice president of TDDR in February 2002.

111.    The Spring Hill and Dunkin Leases clearly misrepresent the actual square footage being occupied by the Marottas.

112.    The Marottas have obtained an independent audit that clearly demonstrates that the total square footage of the shopping center as represented in the lease is incorrect by Spring Hill's own calculations.

113.    The Marottas have obtained an independent audit that clearly demonstrates that the actual square footage being leased by the Marottas as represented in the Lease is being over stated.

114.    The Marottas' audit clearly shows that the Marottas are being overcharged on the pro rata share of the CAM expenses being assessed against them.

115.    The Marottas' audit also clearly shows that Spring Hill is improperly charging certain landlord expenses as CAM charges.

116.   Both Spring Hill and Dunkin and TDDR have been provided with clear and convincing evidence that they are being overcharged for CAM and being charged improperly on certain expenses yet Spring Hill, Dunkin and TDDR have refused to correct the square footage or expense issue.

117.   In fact, both Dunkin and Spring Hill have refused to make any corrections whatsoever.

118.   On numerous occasions, the Marottas have asked for meetings with Dunkin/TDDR's counsel or senior management to bring this issue to their attention and to explain the damages that they are suffering as a result.

119.   Dunkin and TDDR have refused to have such a meeting or to discuss the amicable resolution of the concerns being raised by the Marottas.

120.   Dunkin and TDDR have refused to consider the other commercial lease alternatives available in the area, dismissing them as not comparable without any further explanation.

121.   Dunkin and TDDR have refused to hold Spring Hill accountable for improper CAM charges being assessed against the Marottas and have required the Marottas to pay these without question.

122.   Further, despite clear knowledge of Spring Hill's refusal to correct known errors, Dunkin and TDDR have failed to raise these issues with the Prime Landlord during the lease negotiations.

123.   Dunkin and TDDR have refused to re-negotiate the lease with Spring Hill to ensure that their sub-tenant, the Marottas, will be charged fair market value on the rent.

124.   Upon being told that Spring Hill would not renegotiate the contract, the Marottas have provided numerous other solutions, including but not limited to providing listings for other, comparable commercial spaces for Dunkin/TDDR to lease.

125.   These other commercial locations are comparable, if not better suited for a franchise location, and are at fair market rents.

126.   Dunkin and TDDR have refused these options claiming that they are not comparable without doing any further investigation or providing any details as to why these spaces are unacceptable.

127.   The Marottas have been damaged and continue to suffer damages as a direct and proximate result of the intentional misrepresentations contained in the Leases and Spring Hills and Dunkin's and TDDR's intentional refusal to correct the misrepresentations contained in the Leases.

128.   Dunkin, TDDR and Spring Hill are working together to permit the CAM and rent overcharges to continue and go unquestioned and to steal from the Marottas.

WHEREFORE, the Marottas seek judgment against Spring Hill and Dunkin as follows:

(a) Compensatory damages;
(b) Punitive damages;
(c) Pre and Post-judgment interest;
(d) Counsel fees and costs of suit; and
(e) For such other relief that this court deems just and equitable under the circumstances.

<u>COUNTERCLAIM/THIRD PARTY AMENDED COMPLAINT-COUNT II</u>
(DUNKIN, TDDR and SPRING HILL)
(Civil Conspiracy)

129.   The Marottas reiterate the averments of fact set forth in paragraphs 1 through 128 of the Counterclaim/Third Party Amended Complaint as though recited herein verbatim and at length.

130.   Spring Hill owns the premises being leased to the Marottas pursuant to the Spring Hill and Dunkin Lease.

131.   Spring Hill is aware of the amount of square footage being leased to the Marottas.

132.   Spring Hill is aware of the total amount of square footage of their property.

133.   Spring Hill has intentionally and purposely overstated the pro rata share of the Marottas' CAM responsibility.

134.   Spring Hill has been notified of the square footage discrepancy and has refused to correct the error in the Prime Lease.

135.   Dunkin and TDDR have been notified of the square footage discrepancy and have refused to raise the issue with Spring Hill or correct the issue in the Dunkin Lease.

136.   Dunkin and TDDR have directed the Marottas to obtain the square footage audit and raise the matter directly with Spring Hill.

137.   Spring Hill has refused to deal with the Marottas on the square footage issue claiming that the Marottas have no standing to challenge any terms in the Prime/Prime Lease.

138.   This shell game is preventing the Marottas from having the fraudulent misrepresentations in the lease corrected and further, is permitting Spring Hill to continue to steal from the Marottas.

139.   The Prime Lease is currently in the process of being re-negotiated as it is to be renewed in January 2013.

140.   The Marottas have asked Dunkin and TDDR to raise the CAM and square footage issues with Spring Hill during the re-negotiation process.

141.   The Marottas have asked Dunkin and TDDR to consider other commercially suitable locations and Dunkin' and TDDR have refused.

142.   The Marottas have asked Dunkin and TDDR to negotiate a fair market rent for the Premises and Dunkin' and TDDR have refused.

143.   Spring Hill, TDDR and Dunkin have been provided with an audit that shows that the Landlord's square footage calculations are incorrect.

144.   Spring Hill, TDDR and Dunkin have intentionally refused to act in a commercially reasonable and customary way even though they have been provided with evidence demonstrating that their square footage calculations are incorrect.

145.   Spring Hill, TDDR and Dunkin have acted in concert to perpetrate a fraud upon the Marottas by the following acts:

   a.   Refusing to amend the Dunkin and Prime Leases to reflect the actual square footage of the shopping center;
   b.   Refusing to amend the Dunkin and Prime Leases to reflect the actual square footage being occupied by the Marottas;
   c.   Dunkin/TDDR is further perpetuating the fraud by refusing to re-negotiate the Prime Lease or to find another commercial space at fair market value;
   d.    Spring Hill has improperly charged amounts to its tenants which are not appropriate CAM expenses and Dunkin/TDDR has simply paid these charges without question, ultimately requiring the Marottas to pay the charge without the ability to get verification of the validity of the charge;
   e.   Dunkin/TDDR have refused to seek enforcement of Article 17.4 of the Prime Lease to obtain reimbursements for CAM and rent overpayments to Spring Hill;
   f.   Rather than siding with its franchisee, Dunkin and TDDR have asked the Marottas to sign a lease medication document which releases and discharges all of the Marottas' claims for CAM and rent overpayment and square footage discrepancies against Spring Hill.

18

146.    Together, Dunkin, TDDR and Spring Hill have colluded together to enter into an unfavorable lease that negatively impacts the Marottas, have refused to abide by the terms of the Prime Lease.

147.    Rather than protecting its franchisee, Dunkin has intentionally and purposefully taken steps to guard and protect the Landlord, Spring Hill, by requiring the Marottas to sign a lease amendment which provides a full release and waiver of claims to Spring Hill even though Spring Hill is not a party to the "sublease."

148.    Together, Dunkin, TDDR and Spring Hill have ensured that the Marottas are effectively deprived of any ability to question the square footage or the amount or nature of the CAM charges.

149.    Together, Dunkin, TDDR and Spring Hill have fraudulently misrepresented the total square footage being occupied by the Marottas resulting in the Marottas being held liable for a higher pro rata share of the CAM expense.

150.    Together, Dunkin, TDDR and Spring Hill have refused to correct these misrepresentations either through a lease amendment or through the formation of a new lease that would fairly and accurately reflect the proper square footage.

151.    Instead, Dunkin and TDDR have required the Marottas to sign a lease modification that contains a full release and waiver of claims for Spring Hill's benefit discharging them from any liability for re-payment of any CAM overpayments previously made by the Marottas.

152.    The Marottas have been harmed and continue to suffer damages as a direct and proximate result of the concerted actions of Spring Hill, TDDR and Dunkin.

WHEREFORE, the Marottas seek judgment as follows:

(a) Compensatory damages;
(b) Punitive damages;
(c) Counsel fees and costs of suit;
(d) Pre- and post judgment interest; and
(e) For such other relief that this Court deems just and equitable under the circumstances.

### COUNTERCLAIM/THIRD PARTY AMENDED COMPLAINT-COUNT III
(DUNKIN, TDDR and SPRING HILL)
(Breach of Contract)

153.    The Marottas reiterate the averments of fact set forth in paragraphs 1 through 152 of the Counterclaim/Third Party Amended Complaint as though recited herein verbatim and at length.

154. The Marottas purchased a business from the prior franchisee for the Jenkintown location in July 2009.

155. As a part of that transaction, they were assigned the rights under a document called "AD QSR Lease of Dunkin Donuts/Baskin Robbins" between Third Dunkin' Donuts Realty, Inc. and Let them Eat Cake, Inc.

156. The Prime Lease is for a term of 10 years, starting in February 2002 and terminating in January 2013.

157. The document called a "sublease" by Dunkin and TDDR is for a term of 20 years, starting in December 2002 and terminating in December 2022.

158. Dunkin and TDDR maintain that the agreement between TDDR and the franchisee is a sublease.

159. TDDR assigns all of its rights and responsibilities under the Prime Lease to the Marottas.

160. In the Dunkin Lease, TDDR assigned the entire term of the Prime Lease to the Marottas.

161. As TDDR's assignee, the Marottas stand in TDDR's shoes with respect to Spring Hill in the Prime Lease.

162. As TDDR's assignee, the Marottas have standing to enforce the terms and conditions of the Prime Lease.

163. Spring Hill's fraud and misrepresentations and refusal to comply with Article 17.4 of the Prime Lease constitute material breaches of the Prime Lease.

164. The breaches of the Prime Lease were caused solely by Spring Hill's own actions and material misrepresentations.

165. In the Dunkin Lease, TDDR required the Marottas to pay the same rental and CAM obligations contained in the Prime Lease.

166. In the Dunkin Lease, TDDR required the Marottas to maintain the same insurance as required by the Prime Lease.

167. In the Dunkin Lease, TDDR requires the same permitted use of the premises as contained in the Prime Lease.

168. In the Dunkin Lease, TDDR requires the Marottas to pay the same taxes and liens as required in the Prime Lease.

169. Addendum 26 to the Dunkin Lease specifically provides that "this Lease and all of the rights of the parties hereunder are subject to and subordinate to the Prime Lease."

170. Addendum 26(a) to the Dunkin Lease specifically provides that "Tenant shall perform all affirmative covenants and obligations under the Prime Lease and shall refrain from performing any act which is prohibited by the negative covenants of the Prime Lease."

171. Addendum 26(b) to the Dunkin Lease specifically provides that "All benefits inuring to Landlord as the tenant under the Prime Lease are retained by Landlord unless specifically granted to Tenant under this Lease."

172. An Amendment to the Prime Lease dated October 30, 2002, provides at Paragraph 3 that "Successors and Assigns.  The rights, interests and benefits granted hereby shall inure to the benefit of and be binding upon, as the case may be, the parties hereto and their respective successors, heirs and assigns."

173.  This October 30, 2002 Amendment to the Prime Lease, at paragraph 2(b) amends section 1(p) of the lease relating to the leased premises to change the square footage being leased from 3,152 to 3,167.

174. The October 30, 2002 Amendment was signed by Jayne Fitzpatrick, VP Finance for TDDR and Leo Orloski, president of Spring Hill Realty, Inc.

175. The Dunkin Lease operates as an assignment of all of TDDR and Dunkin's rights and responsibilities under the Spring Hill (Prime Lease) to the Marottas.

176. By virtue of this assignment, the Marottas has standing to name Spring Hill as a party to this action.

177. By virtue of this assignment, the Marottas has standing to seek enforcement of Article 17.4 contained in the Prime Lease.

178. Spring Hill has been put on actual notice that the square footage contained in its Lease with Dunkin misrepresents the space actually being occupied by the Counterclaimant.

179. Both the Prime Lease and Dunkin Lease require that upon presentation of proof that the square footage contained in the lease is incorrect resulting in a CAM overpayment of more than 5%, the overpayments made by the Marottas will be refunded.

180. Both Dunkin and Spring Hill have been provided with conclusive proof that the Marottas have been overcharged for their CAM obligations by more than 5%.

181.    Both Dunkin and Spring Hill have also been provided with conclusive proof that the Marottas have been charged for CAM expenses that are not appropriate.

182.    Both Dunkin and Spring Hill have refused to honor the terms of the Lease or to even discuss these discrepancies with the Marottas.

183.    The Marottas have repeatedly sought a meeting with Dunkin representatives to address these overpayments and overstatements of the square footage.

184.    At each such instance, Dunkin has refused such a meeting.

185.    This meeting would have been an opportunity for Dunkin to avoid litigation on this matter.

186.    Instead, Dunkin and TDDR have threatened that the cost of their counsel fees alone would ruin the Marottas and put them out of business.

187.    Dunkin and TDDR have also threatened to revoke the Franchise Agreements granted for the Marottas two other stores being operated in Perkasie and Philadelphia, PA.

188.    Spring Hill has violated the Dunkin and Prime Lease by charging amounts to the Marottas that are not properly chargeable as CAM and by refusing to refund overpayments of CAM made by the Marottas.

189.    Dunkin has violated the Dunkin Lease by charging improper CAM amounts to the Marottas even though the Marottas have repeatedly questioned the payment of these and the validity of the CAM charges and expenses.

190.    Spring Hill has violated Article 17.4 of the Spring Hill (Prime) Lease by failing to refund the CAM overpayments to the Marottas.

191.    Article 17.2(b) of the Spring Hill (Prime) Lease specifically provides that "Common Area Maintenance Expenses shall not include any Capital Expenditures[.]"

192.    Spring Hill has, on numerous occasions, charged Capital Expenditures as CAM charges.

193.    The Marottas have questioned these charges and asked Dunkin' and TDDR not to pay them.

194.    Disregarding the Marottas' requests, Dunkin/ TDDR have paid the questionable CAM charges without seeking more information from either Spring Hill as to the nature of the charges or from the Marottas as to the nature of the dispute.

195.    Dunkin, TDDR and Spring Hill have failed to honor the terms of the Prime and
        Dunkin Leases in a commercially reasonable manner.

196.    Dunkin, TDDR and Spring Hill have breached the Leases.

197.    The Marottas have been damaged and continue to suffer damages as a direct and
        proximate result of Dunkin's and Spring Hill's actions.

WHEREFORE, the Counterclaimant seeks judgment as follows:

(a) Compensatory damages;
(b) Counsel fees and costs of suit;
(c) Pre- and post judgment interest; and
(d) For such other relief that this Court deems just and equitable under the
    circumstances.


COUNTERCLAIM/THIRD PARTY AMENDED COMPLAINT-COUNT IV
(TDDR/Dunkin)
(Injunction restraining Dunkin/TDDR from renewing the lease with Spring Hill)

198.    The Marottas reiterate the averments of fact contained in Paragraphs 1 through
        197 of the Counterclaim/Third Party Amended Complaint as though recited
        herein verbatim and at length.

199.    The Marottas has notified Spring Hill of the material misrepresentations existing
        in the Prime Lease that have been incorporated by reference into the Dunkin
        Lease.

200.    Spring Hill has refused to correct these material misrepresentations.

201.    Spring Hill has refused to abide by the terms contained in Article 17.4 of its
        Lease with TDDR.

202.    Further, Spring Hill has charged numerous impermissible Capital Expenditures
        against the costs being assessed against the Marottas' pro-rata share of the CAM
        expense.

203.    Spring Hill's refusal to correct the square footage misrepresentation, refund the
        CAM overpayments or correct the improper CAM assessments constitutes a
        substantial and material breach of the Lease.

204.   Spring Hill has been given opportunities to cure these misrepresentations but have refused to do so.

205.   Spring Hill has breached the Prime Lease.

206.   Further, Spring Hill is determined to act with reckless disregard for the tenants' rights and for the stated provisions of the Prime Lease.

207.   Further, while Spring Hill is advertising fair market rental values for its 505 Old York Road, Jenkintown, PA Shopping Center as being between $18-22 per square foot it is unwilling to offer these fair market prices to Dunkin and its franchisee.

208.   Further, the Marottas have been able to locate several other commercial retail spaces that are comparable to the Spring Hill location, if not better.

209.   The commercial spaces that the Marottas have located are consistent with the fair market rental values of $18-22 per square foot.

210.   The Marottas have been damaged and continue to suffer damages as a direct and proximate cause of the fraud being perpetrated upon them by Spring Hill.

211.   Accordingly, the Marottas respectfully request that this Court enter an order restraining Dunkin/TDDR from renewing the current lease with Spring Hill without appropriate protections and without negotiating a fair market lease and amendments to the square footage discrepancies.

212.   Further, the Marottas respectfully request that this Court enter an Order compelling Dunkin/TDDR to negotiate a new lease for a new location in the Jenkintown area with a landlord at a fair market and commercially reasonable rent.

WHEREFORE, the Marottas respectfully request an Order of this Court as follows:

1.   Restraining Dunkin/TDDR from renewing the Prime Lease unless it is at a fair market price per square foot, corrects the square footage calculations, requires reimbursement of overpayments of CAM since July 2009 to the present, and contains other commercially reasonable provisions; and
2.   For such other relief that this Court deems just and equitable under the circumstances.

### COUNTERCLAIM/THIRD PARTY AMENDED COMPLAINT-COUNT V
(DUNKIN/TDDR)
(Breach of Franchise Agreement)

24

213.    The Marottas reiterate the averments of fact set forth in paragraphs 1 through 212 of the Counterclaim/Third Party Amended Complaint as though recited herein verbatim and at length.

214.    Dunkin entered into a Franchise Agreement with the Marottas for significant consideration.

215.    In this Franchise Agreement, Dunkin authorized the Marottas to use and operate the Dunkin logos and brand and system.

216.    The Marottas have paid the consideration to Dunkin and have honored the terms and spirit of the Franchise Agreement in the use and operation of the Dunkin brands and system.

217.    Dunkin has failed to honor the Franchise Agreement as follows:

    a.  Dunkin has failed to act in a commercially reasonable manner by refusing to re-negotiate the Prime Lease to ensure that the Marottas are charged a fair market rent and not over charged for CAM;
    b.  Dunkin has taken steps to protect Spring Hill from having to refund the CAM over payments to the Counterclaimant;
    c.  Dunkin has breached the terms and spirit of the Franchise Agreement by refusing to compel Spring Hill and TDDR to honor the terms of its lease with Dunkin;
    d.  Dunkin has breached the terms and spirit of the Franchise Agreement by siding with and protecting Spring Hill at the expense of the Marottas.

218.    The Marottas have provided Dunkin with numerous elements of proof to show that Spring Hill is acting improperly with respect to the CAM charges being assessed to them.

219.    Dunkin has refused to consider this evidence but rather has sought to terminate the Dunkin lease and the Franchise Agreement.

220.    Dunkin's negligent, reckless, intentional actions taken with wanton disregard for the Marottas' rights have damaged and continue to damage the Marottas.

WHEREFORE, the Counterclaimants/Marottas seeks judgment as follows:

(a) Compensatory damages;
(b) Counsel fees and costs of suit;
(c) Pre- and post judgment interest; and
(d) For such other relief that this Court deems just and equitable under the circumstances.

COUNTERCLAIM/THIRD PARTY AMENDED COMPLAINT-COUNT VI

(DUNKIN/TDDR)
(Fraud-Inducement to Enter into Franchise Agreement)

221. The Marottas reiterate the averments of fact set forth in paragraphs 1 through 220 of the Counterclaim/Third Party Amended Complaint as though recited herein verbatim and at length.

222. As a part of purchasing the business from the prior franchisee, the Marottas were required to assume their Franchise Agreement.

223. To do so, the Marottas had frequent discussions with Dunkin representatives.

224. The Marottas were required to obtain Dunkin's approval prior to being able to purchase the prior franchisee's business.

225. The Marottas were also provided with a copy of the Franchise Disclosure Document which contained the following relevant statements:

  a. "Buying a franchise is a complex investment.  The information in this disclosure document can help you make up your mind." (Cover Page, Franchise Disclosure Document)

  b. "Dunkin Brands employees will provide services to you on behalf of DD under the terms of the Master Servicing Agreement between Dunkin' Brands and DD." (Item 2: Business Experience, p. 7, Franchise Disclosure Document)

226. The Franchise Agreement provides as follows:

  a. "2.0  As a result of the expenditure of time, effort and money, we have acquired experience and skill in the continued development of the Dunkin' Donuts System (the "System"), which involves the conceptualization, design, specification, development, operation, marketing, franchising and licensing of stores and associated concepts for the sale of proprietary and non-proprietary food and beverage products." (Franchise Agreement, p.2)

  b. "In connection with the System, we own or have the right to license certain intellectual property." (Franchise Agreement, p.2)

  c. "2.2  As franchisor, we have the right to establish "Standards" for various aspects of the System that include the location, physical characteristics and operating systems of stores and other concepts; the products that are sold; the qualifications of suppliers; the qualifications, organization and training of franchisees and their personnel; the marketing of products and our brand; and all other things affecting the experience of consumers who patronize our System."  (Franchise Agreement, p.2)

227. Prior to the purchase of the Dunkin Donuts stores and entering into the Franchise Agreement with Dunkin, the Marottas had numerous meetings with various Dunkin representatives who were extremely helpful and responsive to their questions.

228. In particular, the Operations Team were very responsive and worked hard to answer and resolve the Marottas issues.

229. However, following closing, the Operations team changed and the Marottas were faced with the non-responsiveness being experienced by them currently.

230. Dunkin and TDDR appeared to take the position that the Marottas were not permitted to ask any questions but simply had to pay the bills and charges being assessed against them despite knowledge that these charges were incorrect.

231. Dunkin's Leasing Department refused to take any of the Marottas concerns into consideration when dealing with Spring Hill on the lease negotiation.

232. Dunkin's Operations Department and Accounts Payable Departments wouldn't respond to the Marottas' questions regarding the CAM charges even though Dunkin's own employees who were processing the payments thought that the charges appeared inappropriate.

233. The cooperativeness and free flow of information that the Marottas had experienced prior to closing had disappeared and it now appeared that Dunkin was siding with and supporting Spring Hill rather than their own franchisee.

234. Dunkin made numerous written and oral representations to induce the Marottas to purchase these franchises, all of which remained unfulfilled after Dunkin had received its franchise fees.

235. Dunkin's actions with respect to Spring Hill indicate that it will not use its business experience and skills, items for which the Marottas have paid for by franchise fees, to permit the Marottas to succeed in this business.

236. Rather, Dunkin appears to be forcing the Marottas to pay higher rent and CAM charges than are commercially reasonable when they alone have the power to change this situation.

237. The Marottas were lured into purchasing these franchises by Dunkin's pre-closing words and actions.

238. Had the Marottas encountered the current treatment, they would never have entered into these franchise agreements or leases.

239.    The Marottas have been damages and continue to suffer damages as a direct and proximate cause of Dunkin and TDDR's misrepresentations.

WHEREFORE, the Marottas seek judgment against Dunkin and TDDR as follows:

(a) Compensatory damages;
(b) Punitive damages;
(c) Pre- and post-judgment interest;
(d) Counsel fees and costs of suit; and
(e) Such other relief that this Court deems just and equitable under the circumstances.

COUNTERCLAIM/THIRD PARTY AMENDED COMPLAINT-COUNT VII
(Tortious Interference with the Franchise Agreement/Dunkin Lease)
(Spring Hill)

240.    The Marottas reiterate the averments of fact set forth in paragraphs 1 through 239 of the Counterclaim/Third Party Amended Complaint as though recited herein verbatim and at length.

241.    Spring Hill has intentionally breached its Lease and obligations to the Marottas.

242.    By forcing the Marottas to over pay CAM charges and to cover expenses not reasonably and properly includable as CAM, and by failing to provide a refund on these overpayments, Spring Hill has placed the Marottas in an unreasonable and precarious financial position.

243.    By doing so, Spring Hill has caused the Counterclaimant to breach its lease with Dunkin that has caused the termination of the Franchise Agreement as well.

244.    But for Spring Hill's commercially unreasonable and improper action in violation of the terms of the lease, the Marottas would not have breached their lease with Dunkin and the Franchise Agreement would still be in effect.

245.    Spring Hill has acted negligently, recklessly, intentionally and with wanton disregard for the Marottas' rights and has caused damage and continues to damage the Marottas as a direct and proximate result of their actions.

WHEREFORE, the Marottas seek judgment as follows:

(a) Compensatory damages;
(b) Punitive damages;
(c) Counsel fees and costs of suit;
(d) Pre- and post judgment interest; and

(e) For such other relief that this Court deems just and equitable under the circumstances.

COUNTERCLAIM/THIRD PARTY AMENDED COMPLAINT-COUNT VIII
(Tortious Interference with the Prospective Business Advantage)
(Dunkin/TDDR/Spring Hill)

246. The Marottas reiterate the averments of fact set forth in Paragraphs 1 through 245 of the Amended Counterclaim/Third Party Amended Complaint as though recited herein verbatim and at length.

247. Dunkin/TDDR's refusal to negotiate a lease that is reflective of fair market rent or to require Spring Hill to correct the square footage errors have caused the Marottas to pay a higher than necessary rent for the Jenkintown location.

248. The rent currently being paid by the Marottas to Spring Hill far exceeds the price per square foot being charged as fair market rent in the region.

249. The rent currently being paid by the Marottas to Spring Hill also far exceeds the price per square foot being charged by Spring Hill to other tenants and as being advertised to new tenants.

250. In fact, Spring Hill is currently advertising the price of $18-22 per square foot as rent for vacant spaces in their shopping center.

251. Further, Spring Hill is currently promoting the Marottas' Dunkin Donuts store as the premier tenant and anchor store in the shopping center.

252. The Prime Lease is currently in the process of being re-negotiated.

253. Despite being provided with all of this information, Dunkin and TDDR have refused to negotiate a rent reduction to ensure that the new lease would reflect the correct square footage being occupied by the Marottas.

254. Despite being provided with all of this information, Dunkin and TDDR have refused to require Spring Hill to reimburse the Marottas for rent overpayments.

255. Despite being provided with all of this information, Dunkin and TDDR have refused to negotiate a fair market rent with Spring Hill in accordance with their own advertised prices.

256. The Marottas are being penalized by Dunkin and Spring Hill by being required to pay higher rent that other tenants and even new tenants.

257.    The Marottas are being penalized by Dunkin and Spring Hill by being required to pay CAM charges based on inflated square footage.

258.    The current rent and square footage as reflected in the Prime and Dunkin Lease is what is used to calculate the Marottas business tax liability.

259.    Dunkin and TDDR's refusal to use the opportunity to negotiate the lease in a commercially reasonable way and for fair market rent is depriving the Marottas of their ability to make a profit at this Store.

260.    Dunkin and TDDR are taking the profits due to the Marottas and diverting them to Spring Hill.

261.    There is no legitimate business justification for taking the profits due to the Marottas and diverting them to Spring Hill.

262.    There is no legitimate business justification for refusing to negotiate a lease at fair market rent when the opportunity to do so presently exists.

263.    There is no legitimate business justification for refusing to require Spring Hill to correct the square footage currently being reflected in the Prime and Dunkin Leases.

264.    There is no legitimate business justification for any of the actions that Dunkin, TDDR and Spring Hill have taken with respect to the Marottas.

265.    The Marottas have been damaged and continue to suffer damages as a direct and proximate result of the actions of Dunkin, TDDR and Spring Hill.


WHEREFORE, the Marottas seek judgment as follows:

(e) Compensatory damages;
(f) Punitive damages;
(g) Counsel fees and costs of suit;
(h) Pre- and post judgment interest; and
(f) For such other relief that this Court deems just and equitable under the circumstances.

COUNTERCLAIM/THIRD PARTY AMENDED COMPLAINT-COUNT IX
(**Injunctive Relief**)
(To Reinstate The Franchise Agreement pending resolution of this Matter)
(Dunkin/TDDR)

266.   The Marottas reiterate the averments of fact set forth in paragraphs 1 through 265 of the Counterclaim/Third Party Amended Complaint as though recited herein verbatim and at length.

267.   The Prime lease and the Dunkin Lease have been terminated by Spring Hills' refusal to correct the material misrepresentations contained in the Prime Lease and Dunkin Lease and by their refusal to comply with the terms of Article 17.4 of the Prime Lease.

268.   Both Spring Hill and Dunkin have improperly terminated the Lease and the Franchise Agreement.

269.   Spring Hill and Dunkin's own commercially unreasonable actions have tortiously interfered with the Marottas' ability to adhere to the terms of the Prime Lease, the Dunkin Lease and the Franchise Agreement.

270.   Both Spring Hill and Dunkin have intentionally and recklessly refused to honor the terms of the Prime Lease, the Dunkin Lease and the Franchise Agreement to the Marottas' detriment.

271.   Both Spring Hill and Dunkin have tortiously interfered with the Marottas' ability to reasonably honor the terms of the Spring Hill and Dunkin Lease and the Franchise Agreement.

272.   Spring Hill and Dunkin cannot be permitted to benefit from their wrongful actions.

273.   Neither Spring Hill nor Dunkin will be prejudiced by allowing the Marottas to continue to operate the Jenkintown Store and in fact, will continue to receive their share of the proceeds as required by the Franchise Agreement.

274.   The Marottas will suffer a severe miscarriage of justice if they are not permitted to operate the Jenkintown Store during the pendency of this action.


WHEREFORE, the Marottas seek an Order as follows:
(a) The Marottas respectfully seek an order of this Court enjoining both Spring Hill and Dunkin from terminating the leases and the Franchise Agreement during the pendency of this action and permitting the Marottas to operate the Jenkintown Store as though no alleged default had occurred; and
(b) For such other relief that this Court deems just and equitable under the circumstances.


Respectfully submitted,

/s/
_____
Ayesha Hamilton, Esq.
HAMILTON LAW FIRM PC
1816 West Point Pike, Suite 114
Lansdale, PA 19446
Tel. (215) 699-8840
Fax. (215) 699-8842

Dated: July 5, 2012

VERIFICATION

I, Manfred Marotta, being of age and sound mind, do hereby verify and say:

1.      I am one of the Defendants/ Marottas named in the above captioned matter;

2.      As such, I am both authorized and qualified to verify this pleading;

3.      I have reviewed the pleading and the attached documents and hereby verify the truth and accuracy of the statements contained herein to the best of my ability.

4.      I am aware that if any thing contained herein is willfully false, I am subject to punishment under the penalties of perjury.

/s/ Signature sheet attached /s/

_____

Manfred Marotta

Dated: July 5, 2012