**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DUNKIN' DONUTS FRANCHISED** | **:** | |
| **RESTAURANTS, LLC, DD IP** | **:** | |
| **HOLDER, LLC, BASKIN-ROBBINS** | **:** | |
| **FRANCHISED RESTAURANTS,** | **:** | **CIVIL ACTION** |
| **LLC and DB REAL ESTATE** | **:** | |
| **ASSETS I, LLC,** | **:** | |
|       **Plaintiffs,** | **:** | |
| | **:** | |
|     **v.** | **:** | |
| | **:** | |
| **CLAUDIA I, LLC, MANFRED P.** | **:** | **No. 12-2010** |
| **MAROTTA and LYNNE K.** | **:** | |
| **MAROTTA,** | **:** | |
|       **Defendants.** | **:** | |
| | **:** | |
|     **v.** | **:** | |
| | **:** | |
| **SPRING HILL REALTY, INC.,** | **:** | |
|     **Third Party Defendant.** | **:** | |

## M E M O R A N D U M

**STENGEL, J.**                                                            **July 15, 2013**

      This dispute involves a franchising relationship gone awry. The franchisee

brought suit against the franchisor for breach of the franchise agreement. In response, the

franchisor filed a third party complaint against the property owner renting the store

location. The property owner moved to dismiss the third party complaint. For the

reasons set forth below, I will deny the motion.

### I.      Background

      Plaintiffs, Franchised Restaurants, LLC, DD IP Holder, LLC Baskin-Robbins

Franchised Restaurants, LLC and DB Real Estate Assets I, LLC (Collectively "Dunkin'")

filed this action against a Defendant Franchisee seeking relief for breach of the franchise agreement against Defendants, Claudia LLC, comprised of members Manfred and Lynne Marotta, ("Claudia" or "the Marottas").[1] On or about May 15, 2012, Claudia responded to the Complaint by filing a Third Party Complaint against Third Party Defendant, Spring Hill Realty ("Spring Hill"), alleging causes of action against Spring Hill for fraud, civil conspiracy, breach of contract, tortious interference with contract and injunctive relief. Spring Hill has now moved to dismiss Claudia's Complaint against it.

Dunkin' and Spring Hill entered and executed the Prime Lease on or about March 1, 2002. Spring Hill owns and maintains the tenanted property leased by Dunkin'. Dunkin' did not enter into the Sublease for the Premises until on or about December 20, 2002. On July 16, 2009, Claudia purchased the existing Dunkin' franchise in Jenkintown and took the predecessor's tenant interest and franchise agreement by assignment. Claudia and Dunkin' Donuts then entered into a franchise agreement and a transfer agreement.[2] The transfer agreement provided that Claudia acquired by assignment a

---

[1] Plaintiffs are the exclusive licensees of numerous federal registrations for the mark Dunkin' Donuts, Baskin-Robbins, or derivations thereof, as well as numerous other trademarks. See The United States Patent and Trademark Office the trademark DUNKIN' DONUTS at serial numbers 73215289, 76035918 and 73214414, as well as the trademark BASKIN 31 ROBBINS at registration numbers 3124983 and 3124982.

[2] The franchise agreement required remodeling and refurbishment by December 21, 2012. Additionally, the terms of the agreement provided termination of the right to use the premises ends the franchise agreement: "Default occurs if franchisee breaches and obligation under another agreement necessary to the operation of the Store." (Franchise Agreement at ¶ 14.0.1). Finally, the franchise agreement provides there is "No cure 'if your lease for the Store is terminated…(or)… you have received three or more previous notices to cure.'" (Id. at ¶14.2).

The agreement also contained an integration clause stating:

> The Franchise Agreement (Ex. C) contains the following integration clause and disclaimer language: 16.6 This Agreement and the documents referred to herein shall be the entire, full and complete agreement between you and us concerning the subject matter of this Agreement, which supersedes all prior agreements….

tenant's interest in the sublease at the Jenkintown location.[3]  The Sublease contains a number of relevant paragraphs discussing details of the agreement.[4]

Relevant to this discussion, Article 11 of the Prime Lease states that Spring Hill has consented to the assignment and/or subletting of the premises to a franchisee. Addendum 26(b) to the Sublease specifically provides that "[a]ll benefits inuring to [Dunkin'] as tenant under the [Prime Lease] are retained by [Dunkin'] unless specifically granted to [Claudia] under [the Sublease]."  Article 5, section 5.1 of the Prime Lease provides that "the Premises may be used by [Dunkin'] for the Permitted Use, or any other lawful purpose including any other Allied Domecq QSR food operation."

Article 17.4 specifically provides that where "the Common Area Maintenance Expenses are found to be overstated by 5% or more, and as a result Tenant has over paid

---

16.7 Your success in this business is speculative and depends, to an important extent, upon your ability as an independent business owner. We do not represent or warrant that the Store will achieve a certain level of sales or will be profitable, notwithstanding approval of the location. By your signature below, you acknowledge that you have entered into this Agreement after making an independent investigation of the Dunkin' Donuts and Baskin-Robbins Systems.

[3] The transfer agreement contains an integration clause stating:

The prospects for success of the business venture undertaken by BUYER by virtue of the Franchise Agreement is speculative and depends to a material extent upon BUYER's capability as an independent franchisee, as well as other factors.  FRANCHISOR makes no representations or warranties as to the potential success of the business venture undertaken by BUYER hereby. BUYER represents that it has entered into this Agreement after making independent investigations of SELLER's business, and not in reliance upon any representation FRANCHISOR as to sales or profits which BUYER might be expected to realize.  BUYER further represents and warrants that FRANCHISOR and its representatives, employees and agents have made no representations to induce BUYER to acquire this franchise and execute this Agreement which are not expressly set forth herein.

[4] Paragraph 1.10 states that the term of the lease is 20 years from December 20, 2002.  Paragraph 1.8 states that the payment of base rent is $9,583.33.  Prior to December 2012, the Sublease provided for minimum rent of $8,750.00 per month.  Beginning in January 2013, the Sublease provides for minimum rent of $9,583.33 per month.

Paragraphs 6 and 7(a) state that tenant is responsible for failure to pay taxes and additional rent such as common area maintenance.  Paragraph 18 states tenant shall be in default for failure to pay rent and 18(d) states that the tenant will have 10 day notice to cure and no notices required for more than one default within one year.  Finally, paragraph 18(e) states that upon termination of the lease, the landlord is entitled to possession of the property.

for Tenant's pro rata share of such expenses by more than fifteen hundred Dollars ($1500), Landlord shall bear the cost of such inspection, excluding the cost of travel and lodging.  Landlord shall promptly refund to Tenant any overpayment[.]"

The square footage representations contained in Paragraph 1.1(p) of the Prime Lease are specifically incorporated into the Sublease at Paragraph 1.6.[5]  The amount of square footage being leased by Dunkin' and Claudia has a direct impact on the amount of Common Area Maintenance (CAM) that Claudia is required to pay.[6] Claudia ordered and received a completed square footage audit in February 2011 that provides an alternative to the square footage of the lease premises named in the Prime Lease and the Sublease. The difference in square footage stated in the Sublease versus what was revealed in Claudia's audit is 384.4 square feet, which represents more than a 10% difference.[7]

## II.    Procedural History

On June 13, 2012, Spring Hill moved to dismiss the Third Party Complaint or, in the alternative, a motion for a more definite statement.  On July 6, 2012, Claudia moved for leave to amend the Third Party Complaint.  On July 13, 2012, Claudia responded in opposition to Spring Hill's motion to dismiss.  On August 20, 2012, I granted Spring Hill's motion for a more definite statement and granting Claudia's motion for leave to

---

[5] According to the Prime Lease, Claudia occupies 5084 square feet.

[6] An Amendment to the Prime Lease dated October 30, 2002, provides at Paragraph 3 that "Successors and Assigns. The rights, interests and benefits granted hereby shall inure to the benefit of and be binding upon, as the case may be, the parties hereto and their respective successors, heirs and assigns."  This October 30, 2002, Amendment to the Prime Lease, at paragraph 2(b) amends section 1(p) of the lease relating to the leased premises to change the square footage being leased from 3,152 to 3,167.

[7] Article 1.1(h) of the Prime Lease defines the "Landlord's Floor Area" as being the "aggregate amount of square feet of leasable floor area in the Shopping Center" and the usual and customary definition of which requires the calculation of square footage from the internal walls.

amend the Third Party Complaint.  I denied Spring Hill's motion to dismiss, but without prejudice to the parties' right to raise the arguments at a later time.

Thereafter, on September 10, 2012, Dunkin' filed an Amended Complaint, correcting and adjusting the parties named as plaintiffs and updating the amount owed by Claudia.  In response to the Amended Complaint, on September 28, 2012, Claudia filed a Third Amended Answer, including therewith the Third Party Amended Complaint.  The Third Party Amended Complaint alleges, inter alia, causes of action against Spring Hill for fraud, civil conspiracy, breach of contract, tortious interference with contract, and tortious interference with "prospective business advantage."

### III.    Standard of Review

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure examines the legal sufficiency of the complaint.  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  The factual allegations must be sufficient to make the claim for relief more than just speculative.  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  In determining whether to grant a motion to dismiss, a federal court must construe the complaint liberally, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff.  Id.; see also D.P. Enters. v. Bucks Cnty. Cmty. Coll., 725 F.2d 943, 944 (3d Cir. 1984).

The Federal Rules of Civil Procedure do not require a plaintiff to plead in detail all of the facts upon which he bases his claim.  Conley, 355 U.S. at 47.  Rather, the Rules require a "short and plain statement" of the claim that will give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests.  Id.  The "complaint must

allege facts suggestive of [the proscribed] conduct." Twombly, 550 U.S. at 564. Neither

"bald assertions" nor "vague and conclusory allegations" are accepted as true. See Morse

v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997); Sterling v. Se. Pa. Transp.

Auth., 897 F. Supp. 893 (E.D. Pa. 1995). "Threadbare recitals of the elements of a cause

of action, supported by mere conclusory statements, do not suffice." Fowler v. UPMC

Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (quoting Ashcroft v. Iqbal, 129 S.Ct. 1937,

1949 (2009)). The claim must contain enough factual matters to suggest the required

elements of the claim or to "raise a reasonable expectation that discovery will reveal

evidence of" those elements. Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234 (3d Cir.

2008) (quoting Twombly, 550 U.S. at 556).

In Fowler, 578 F.3d at 210, the United States Court of Appeals for the Third

Circuit provided a two-part test to determine whether a claim survives a motion to

dismiss. "First, the factual and legal elements of a claim should be separated. The

District Court must accept all of the complaint's well-pleaded facts as true, but may

disregard any legal conclusions." Id. at 210-11 (quoting Iqbal, 129 S.Ct. at 1949).

"Second, a District Court must then determine whether the facts alleged in the complaint

are sufficient to show that the plaintiff has a 'plausible claim for relief.'" Id. (quoting

Iqbal, 129 S.Ct. at 1950). The plaintiff must show "the allegations of his or her

complaints are plausible." Fowler, 578 F.3d at 211 (quoting Phillips, 515 F.3d at 234-

35). "Where the well-pleaded facts do not permit the court to infer more than the mere

possibility of misconduct, the complaint has alleged–but it has not 'show[n]'–'that the

pleader is entitled to relief.'" Id. (quoting Iqbal, 129 S.Ct. at 1949). This "'plausibility'

determination will be 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Fowler, 578 F.3d at 211 (quoting Iqbal, 129 S.Ct. at 1949).

## IV. Discussion

### A. Count III: Breach of Contract

It is imperative to discuss the motion to dismiss Count III of the Amended Third Party Complaint first as it implicates whether Claudia has standing to bring suit against Spring Hill.  Claudia argues that it should be regarded as an intended third party beneficiary of the Prime Lease between Spring Hill and Dunkin', or in the alternative that Dunkin' assigned its rights and obligations under the Prime Lease to Claudia pursuant to the Sublease.[8]  Claudia argues that as the intended beneficiaries of the Prime Lease, it has the standing and privity to enforce the terms of the Prime Lease and maintain actions for fraud and conspiracy against Spring Hill.  Specifically, Claudia argues that Spring Hill's fraud, misrepresentations, and refusal to comply with Article 17.4 of the Prime Lease constitute material breaches of the Prime Lease.[9]

Spring Hill argues that Claudia fails to allege the existence of a contract between itself and Spring Hill because Claudia fails to set forth any facts showing it was, in fact, a third party beneficiary and, therefore does not have standing.  Additionally, Spring Hill

---

[8] The Complaint states that Claudia is a third party intended beneficiary of the lease between Spring Hill and Dunkin' because Claudia stand in Dunkin's shoes in all respects and Spring Hill has consented to the assignment/sublease.

[9] Claudia alleges in its Amended Third Party Complaint that "Spring Hill has violated the Dunkin' and Prime Lease by charging amounts to the Marottas that are not properly chargeable as CAM and by refusing to refund overpayments of CAM made by the Marottas." (Doc. No. 50 at 21).  Claudia argues that the misrepresentations regarding the amount of square footage actually occupied by the Marottas has resulted in the Marottas being required to pay a larger share of the CAM charge that would be required if the square footage were properly stated.

argues that Claudia has not alleged a breach of any duty imposed by an alleged contract and fails to allege any actual damages resulting from any violative conduct by Spring Hill.

     *i.     Intended Beneficiary*

In general, a person must be in privity of contract to sue for damages for breach of such contract. However, under certain conditions a person may sue as a third party beneficiary to a contract. Visor Builders, Inc. v. Devon E. Tranter, Inc., 470 F. Supp. 911, 923 (M.D. Pa. 1978) (noting that a third-party beneficiary is "one who, although not a party to the contract, and hence, not in privity with the promisor . . . is permitted to enforce the contract between the promisor and the promisee for its (the third-party beneficiary's) benefit"); Kmart Corp. v. Balfour Beatty, Inc., 994 F. Supp. 634, 636, 38 V.I. 251 (D.V.I. 1998) (noting that "[a]n intended beneficiary acquires a right under the contract" while "[a]n incidental beneficiary does not").[10]

Pursuant to Section 302 of the Restatement (Second) of Contracts (1981), Spring Hill is the promisor and Dunkin' is the promisee of the Prime Lease, and Claudia is the "beneficiary."[11] A beneficiary may be either intended or incidental as defined by Section

---

[10] An example of an intended beneficiary articulated in Restatement (Second) of Contracts § 302 (1981) is "B promises A to furnish support for A's minor child C, whom A is bound by law to support. C is an intended beneficiary under Subsection (1)(a)." Some examples of Incidental Beneficiaries articulated in Restatement (Second) of Contracts § 302 (1981) include: 1) "B contracts with A to erect an expensive building on A's land. C's adjoining land would be enhanced in value by the performance of the contract. C is an incidental beneficiary;" 2) "B contracts with A to buy a new car manufactured by C. C is an incidental beneficiary, even though the promise can only be performed if money is paid to C;" and 3) "A contracts to erect a building for C. B then contracts with A to supply lumber needed for the building. C is an incidental beneficiary of B's promise, and B is an incidental beneficiary of C's promise to pay A for the building."

[11] A beneficiary is the third party who will benefit from the performance of the contract. See Restatement (Second) of Contracts § 302 (1981).

302.[12]  To determine whether a third party is an intended beneficiary, courts "examine the terms of the agreement and the surrounding circumstances."[13]  Grant, 780 F. Supp. at 249 (citation omitted); see also Johnson v. Superior Court, 80 Cal. App. 4th 1050, 1064, 95 Cal. Rptr. 2d 864 (2000).  In Pennsylvania, "[i]n order a third party beneficiary to have standing to recover on a contract, both contracting parties must have expressed an intention that the third party be a beneficiary, and that intention must have affirmatively appeared in the contract itself."  Burks v. Federal Ins. Co., 883 A.2d 1086, 1087-88 (Pa. Super. Ct. 2005) (quoting Scarpitti v. Weborg, 609 A.2d 147, 149 (Pa. 1992).

There is a narrow exception to this rule for a "restricted cause of action" under Section 302 of the Restatement of Contracts (Second).  To avail oneself of this limited exception, a party must prove that "(1) recognition of the beneficiary's right must be appropriate to effectuate the intention of the parties; and (2) performance must satisfy an obligation of the promisee to pay money to the beneficiary or the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."  Guerra, 2011 U.S. Dist. LEXIS 37242, * 5 (citing Guy v. Liederbach, 459

---

[12] Section 302 defines intended and incidental beneficiaries as follows:

> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
>> (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
>> (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
> (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

Restatement (Second) of Contracts § 302 (1981).

[13] "Whether a party is an intended third-party beneficiary with standing to enforce a contract is a question of law for the Court."  Guerra v Springdell Village Homeowners Assoc., 2011 U.S. Dist. LEXIS 37242, *5 (E.D.Pa. 2011) (citing Shumate v. Twin tier Hospitality, LLC, 655 F. Supp. 2d 521, 535 (M.D.Pa. 2009)).

A.2d 744, 751 (Pa. 1983) (adopting Rest. (Second) of Contracts, § 302)). In other words, the circumstances are so compelling that "recognition of the beneficiary's right is appropriate to effectuate the intention of the parties." Id. (quoting Scarpitti, 609 A.2d at 150); State Farm Mutual Auto Ins. Co. v. HHS Assocs., Inc., 1995 U.S. Dist. LEXIS 18380, *4 (E.D. Pa. December 1, 1995); Blue Mountain Mushroom Co., Inc. v. Monterey Mushroom, Inc., 246 F. Supp. 2d 394, 401 (E.D. Pa. 2002).

Although Claudia does not cite any specific language in the Dunkin'-Spring Hill contract that might evidence Dunkin's and Spring Hill's intent to benefit Claudia, they allege facts to support "compelling circumstances" and the parties' intent. Claudia argues that the Sublease requires that any claims that Claudia may have against Spring Hill must be raised directly with Spring Hill. Additionally, Claudia notes that, "In the Dunkin Lease, TDDR required the Marottas to pay the same rental and CAM obligations contained in the Prime Lease[;] In the Dunkin Lease, TDDR required the Marottas to maintain the same insurance as required by the Prime Lease[;] In the Dunkin Lease, TDDR requires the same permitted use of the premises as contained in the Prime Lease[;] In the Dunkin Lease, TDDR requires the Marottas to pay the same taxes and liens as required in the Prime Lease." Doc. No. 50 at 19.

Claudia also argues that Prime Lease specifically defines the "permitted use" for the premises as being the "operation of a quick service restaurant" under the Dunkin', Baskin Robbins, or Togo's brands. Because Dunkin' does not maintain any corporate run stores and stores are operated only through their franchisees, Claudia argues that promised benefit of the Prime Lease, i.e. possession and use of the premises, runs directly

to Claudia.  Claudia also argues that Dunkin' informed Claudia that it would need to assume the Prime Lease.  Finally, Claudia argues that the entire terms and all of the obligations under the Prime Lease have been assigned to Claudia under the  Sublease, thereby permitting them the right to enforce the terms of the Prime Lease.  Therefore, as third party beneficiaries of the Prime Lease, Claudia argues that it has privity to seek enforcement of the Prime Lease and to seek damages for Spring Hill and Dunkin's breach of their obligations under the Prime Lease.

Spring Hill argues that the timing of the contract necessarily precludes the argument that Claudia was an intended beneficiary because Claudia was not even the original franchisee and did not have any knowledge of the contract or any benefit therefrom for many years past its original execution.[14]  Spring Hill also argues that the Addendum 26(b) language in the Prime Lease does not prove that Dunkin' just assigned Claudia its interests under the Lease with Spring Hill.  Spring Hill contends that Addendum 26(b) presents an express reservation by Dunkin' of "all benefits inuring to Dunkin' under the Lease except as otherwise specifically granted to Claudia in the Sublease."

Claudia contends that because the Prime Lease defines "Permitted Use" as the operation of a particular kind of restaurant under Dunkin's well-known trademarks, the Prime Lease necessarily promises Claudia the benefit of some performance.  Spring Hill counters that this argument is illogical and contrary to the Prime Lease's plain meaning.

---

[14] Dunkin' and Spring Hill entered and executed the Lease on or about March 1, 2002.  Dunkin' did not enter into the Sublease for the Premises until on or about December 20, 2002.  And Claudia did not assume responsibility for the Sublease until on or about July 16, 2009.

Contrarily, by its terms, the "Permitted Use" definition merely expresses an authorization to Dunkin' that it may operate a certain kind of restaurant on the premises. Spring Hill also notes that the Prime Lease provides Dunkin' the authority for "*any other lawful purpose* including any other Allied Domecq QSR food operation." (emphasis added). Finally, Spring Hill argues that Claudia fails to demonstrate circumstances so compelling that recognition of its claimed right is appropriate to effectuate the intention of the parties, and thus cannot establish intended third party beneficiary status.

While I agree with Spring Hill that Claudia has not alleged sufficient facts to *prove* that Spring Hill intended to benefit Claudia through its lease agreements with Spring Hill, rather than simply benefitting itself from use of the premises, this is a motion to dismiss and Claudia need only allege sufficient facts to overcome the standard articulated above. "Under Pennsylvania law, the intention of the parties and 'compelling circumstances' must be considered when determining whether a party is a third party beneficiary of a contract."[15] <u>Fondrk v. Westmoreland County</u>, 2006 U.S. Dist. LEXIS 41286, at *8 (W.D. Pa. June 16, 2006). Because at this juncture I must draw any inferences favorable to Claudia, I cannot make determinations regarding the parties' intent and whether circumstances are compelling in this case based on Spring Hill's motion to dismiss. Therefore, dismissing Claudia's third-party beneficiary claim at this stage in the proceedings is premature because the inquiry involves factual questions of

---

[15] Under the Erie doctrine, Pennsylvania substantive law must be applied to these contract claims. <u>Erie R. Co. v. Tompkins</u>, 304 U.S. 64 (1938); <u>Three Rivers Motors Comp. v. The Ford Motor Company</u>, 522 F.2d 885, 888-89 & n.5 (3d Cir. 1975) (whatever the basis for federal jurisdiction, the Erie doctrine applies to any issue or claim that has its source in state law).

intent.  See Solid Host, NL v. Namecheap, Inc., 652 F. Supp. 2d 1092, 1119 (C.D. Cal.

2009).[16]  However, my decision is without prejudice to any later dispositive motions on

this issue.

### ii.    *Breach of Contract*

In order to establish an action for breach of contract, Claudia must prove: (1) the

existence of a contract; (2) a breach of a duty imposed by the contract; and (3) resultant

damages.  AAMCO Transmissions, Inc. v. Wirth, 2011 U.S. Dist. LEXIS 140457, 23-24

(E.D. Pa. Dec. 7, 2011); McShea v. City of Phila., 995 A.2d 334, 340 (Pa. 2010)

(providing the elements of a breach of contract claim are the existence of a contract, a

breach of that contract, and damages arising from the breach).  Because I have denied

Spring Hill's motion to dismiss based on the parties' potential contractual relationship, I

will deny the motion to dismiss the breach of contract claim.

### B.  Count I: Fraud

The elements of a claim of common law fraud include: (1) a representation; (2)

material to the transaction at issue; (3) made falsely, with either knowledge or reckless

disregard of its falsity; (4) with the intent to misleading another person or inducing

justifiable reliance; and (5) an injury caused by the reliance.  Bennett v. A.T. Masterpiece

Homes at Broadsprings, LLC, 40 A.3d 145, 152 n. 5 (Pa. Super. Ct. 2012) (citing Bortz

v. Noon, 729 A.2d 555, 560 (Pa. 1999)).  Pursuant to Federal Rule of Civil Procedure

---

[16] Although Spring Hill argues that courts have dismissed claims at this stage of the proceedings when "it is clear
from the Agreement that plaintiff was never intended as a third-party beneficiary," McLane Foodservice, Inc. v.
Ready Pac Produce, Inc., 2012 U.S. Dist. LEXIS 89087 (D.N.J. June 27, 2012) (citing Grant, 780 F. Supp. 246,
249); however, those cases involve contractual language specifically excluding any potential third party
beneficiaries.  That is simply not the case on these facts.

9(b), fraud requires a heightened pleading standard from mere "notice" pleading.  Rule 9(b) mandates a "heightened standard requiring that facts be pleaded with particularity." Kanter v. Barella, 489 F.3d 170, 175 (3d Cir. 2007).  To properly plead a claim of fraud, a plaintiff must state with particularity the "who, what, when, where, and how of the events at issue."  Id. (quoting In re Burlington Coat Factory Sec. Litig., 114 F. 3d 1410, 1422 (3d Cir. 1997)).

Spring Hill argues that Claudia is not a party to the Prime Lease and could not plausibly prove that Spring Hill made a representation regarding square footage that would be material to Claudia's Sublease with Plaintiffs.  Therefore, Spring Hill argues, Claudia fails to allege any representation actually made by Spring Hill to Claudia, much less one made falsely, with knowledge or reckless disregard of its falsity, or with the intent to misleading another person or inducing justifiable reliance.  Spring Hill also notes that Dunkin' was the party who supplied the total square footage figures that were included in the Prime Lease.  Claudia argues that it has plead its fraud claim with sufficient specificity and has detrimentally relied on the square footage by paying CAM charges above what it should have been obligated to pay.

As the Third Circuit has explained, a "plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation" in order to "place the defendant on notice of the 'precise misconduct with which [it is] charged.'"  Frederico  v. Home Depot 507 F.3d 188, 200 (3d Cir. 2007).  I am not convinced that Claudia has failed to allege the claim with sufficient specificity. Spring Hill cannot possibly be under informed about the

contract agreement, specific provision, relationship, and transaction to which Claudia

refers in the Third Party Complaint. Further, Claudia did denote the requisite details to

put Spring Hill on notice and to survive the Rule 9(b) requirements.

However, I find it pertinent to discuss a complication of Claudia's breach of

contract and tort claims. The Superior Court of Pennsylvania and federal courts have

held that fraud claims can be barred by the "gist of the action."[17] See, e.g., Etoll, Inc. v.

Elias/Savion Advertising, Inc., 2002 PA Super 347, 811 A.2d 10, 19-20 (Pa. Super 2001).

Under Pennsylvania's "gist of the action" doctrine,

> to be construed as a tort action, the [tortious] wrong ascribed to the
> defendant must be the gist of the action with the contract being collateral. . .
> . [T]he important difference between contract and tort actions is that the
> latter lie from the breach of duties imposed as a matter of social policy
> while the former lie for the breach of duties imposed by mutual consensus.

Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79, 103-04 (3d Cir.

2001) (alterations in original) (citations omitted). The doctrine bars tort claims "(1)

arising solely from a contract between the parties; (2) where the duties allegedly breached

were created and grounded in the contract itself; (3) where the liability stems from a

contract; or (4) where the tort claim essentially duplicates a breach of contract claim or

the success of which is wholly dependent on the terms of a contract." Reed v. Dupuis,

2007 PA Super 68, 920 A.2d 861, 864 (Pa. Super. Ct. 2007) (internal citations omitted).

Moreover, promises made to induce a party to enter into a contract that eventually

become part of the contract itself cannot be the basis for a fraud-in-the inducement claim

---

[17] "The Pennsylvania Supreme Court has not expressly adopted the gist of the action doctrine," though "both the United States Court of Appeals for the Third Circuit and the Pennsylvania Superior Court have predicted it would do so." Vives v. Rodriguez, 849 F. Supp. 2d 507, 516 (E.D. Pa. 2012), (quoting PPG Indus., Inc. v. Generon IGS, Inc., 760 F. Supp. 2d 520, 527 n.1 (W.D. Pa. 2011)).

under the "gist of the action" doctrine.  See Owen J. Roberts Sch. Dist. v. HTE, Inc., No. 02-7830, 2003 U.S. Dist. LEXIS 2997, at *14 (E.D. Pa. Feb. 28, 2003) (finding that the gist of the action doctrine barred a fraudulent inducement claim because "negotiation stage statements…eventually resulted in specific contractual duties").  Additionally, as is reflected in the gist-of-the-action doctrine, Pennsylvania courts are reluctant to recognize tort liability for purely economic loss.  In contract actions, the economic loss doctrine prohibits claims of intentional fraud when economic losses are incurred from breach of contractual obligations.  Werwinski v. Ford Motor Co., 286 F.3d 661, 680 (3d Cir. 2002).  Although it is pertinent that courts have been wary of relying on the economic loss doctrine alone where the claim does not allege a pure products liability case of action, Hospicomm, Inc. v. Fleet Bank, N.A., 338 F. Supp. 2d 578, 583 & n.4 (E.D. Pa. 2004), it should be noted that the Pennsylvania Superior Court has suggested that the economic loss doctrine, which is related to the "gist of the action" doctrine, may apply to tort claims filed by *third-party beneficiaries* of a contract.  David Pflumm Paving & Excavating, Inc. v. Foundation Srvcs. Co., et al., 816 A.2d 1164 (Pa. Super. Ct. 2003).[18]

I acknowledge that I must exercise caution in making a determination regarding the gist of the action or economic loss doctrine at this early stage of the case.[19]  See, e.g.,

---

[18] Accord Wilmington Fin., Inc. v. Am. One Fin., Inc., No. CIV.A.06-5559, 2007 U.S. Dist. LEXIS 55738, 2007 WL 2221424, at *2 n.1 (E.D. Pa. Jul. 31, 2007) (noting that "[t]he economic loss and gist of the action doctrines are very closely related and share the common purpose of maintaining the distinction between contract and tort law." Where the action is not a products liability action, the "gist of the action" doctrine is more appropriate.)

[19] The situation presents far too many alternative analyses.  For instance, as an intended third party beneficiary, Claudia will be held to the contractual agreement between Dunkin' and Spring Hill.  If however, Claudia is merely an incidental third party beneficiary, then Claudia would have no contractual rights in the matter.  See RESTATEMENT (SECOND) OF CONTRACTS § 315("An incidental beneficiary acquires by virtue of the promise no right against the promisor or the promisee").  In that case, any duty that Spring Hill had to refrain from misrepresentations would stem solely from social policy and the gist of the action or the economic loss doctrine

Integrated Waste Solutions, 2010 U.S. Dist. LEXIS 127192, 2010 WL 4910176, at *11;

Weber Display & Packaging v. Providence Wash. Ins. Co., No. 02-7792, 2003 U.S. Dist.

LEXIS 2187, 2003 WL 329141, at *4 (E.D. Pa. Feb.10, 2003).  Although it is possible

that Claudia's fraud claims are barred because they potentially arise solely from the

alleged "contractual relationship" between the parties and the success of the fraud claim

is dependent on the success of the breach of contract claim,[20] dismissing the case is

premature because the validity of the contractual relationship between the parties is in

dispute.[21]  See Premier Payments Online, Inc. v. Payment Systems Worldwide, 848 F.

---

would not bar Claudia's fraud and other tortious claims.  Conversely, as an intended beneficiary, some or all of the Claudia's tort claims may be barred.  I will not engage in the academic exercise of discussing each hypothetical as I have insufficient facts before me at this stage of the proceedings, but will certainly permit a discussion on these issues at the appropriate time.  Further, Federal Rule of Civil Procedure 8(d) allows a plaintiff to plead alternative theories of liability.

[20] See Reardon v. Allegheny College, 2007 PA Super 160, 926 A.2d 477, 486 (Pa. Super. 2007).

[21] There is a split of authority between Pennsylvania courts and the Third Circuit regarding whether a non-party to a contract can be barred by the gist of the action doctrine.  This case presents a unique situation as Claudia has merely survived a motion to dismiss based on the third party beneficiary argument.  Although it appears some Pennsylvania courts will not invoke the gist of the action doctrine if a party is not part of the contract, fellow district courts willingly do so if the doctrine's test is met.  For example, in Centimark Corp. v. Pegnato & Pegnato Roof Management, Inc., No. 05-708, 2008 U.S. Dist. LEXIS 37057, 2008 WL 1995305, at *13 (E.D. Pa. May 6, 2008), the Court determined that the defendants were unable to invoke the gist of the action doctrine to foreclose litigation of the conversion claim against them individually because they, as individuals, were not parties to the contract. Centimark Corp., 2005 U.S. Dist. LEXIS 20309, 2008 WL 1995305, at *13.  In Levert v. Philadelphia Int'l Records, No. 04-1489, 2005 U.S. Dist. LEXIS 20309, 2005 WL 2271862, at *3 (E.D. Pa. Sept. 16, 2005)., the Court found that the gist of the action doctrine did not apply to the defendant because he was not a party to any contract and there was no agreement between the parties.  Levert, 2005 U.S. Dist. LEXIS 20309, 2005 WL 2271862, at *3. However, in Williams v. Hilton Group, PLC, the United States Court of Appeals for the Third Circuit looked at the overall relationship of the parties and their involvement in the contract at issue in concluding that the gist of the action doctrine did bar a tort claim against a defendant even though that defendant was not a signatory to the contract.  Williams, 93 F. App'x 384, 385 (3d Cir. 2004). The Third Circuit stated:

> [W]e hold that the District Court did not err in concluding that the doctrine barred Williams' claims against Ross, as well as his claims against Ladbrokes. Although Williams did not have a contractual relationship with Ross, Williams cannot detach Ross from his status as an agent for Ladbrokes. Ross served as the principal negotiator for Ladbrokes. As the Pennsylvania courts have spelled out, the gist of the action doctrine bars tort claims against an individual defendant where the contract between the plaintiff and the officer's company created the duties that the individual allegedly breached.

Supp. 2d 513 (E.D. Pa. 2012)); Hart v. Univ. of Scranton, 838 F. Supp. 2d 324, 329

(M.D. Pa. Dec. 16, 2011) (declining to apply gist of the action doctrine where the "very

existence of the contract" was "unsettled"). Accordingly, Claudia does not fail to state a

claim for fraud upon which relief can be granted.[22]

C. Count II: Conspiracy

To establish a civil conspiracy, Claudia must establish: (1) a combination of two

or more persons acting with a common purpose to do an unlawful act or to do a lawful act

by unlawful means or for an unlawful purpose, (2) an overt act done in pursuance of the

common purpose, and (3) actual legal damage. Phillips v. Selig, 959 A.2d 420, 437 (Pa.

Super. 2008) (internal citations omitted). Further, "absent a civil cause of action for a

particular act, there can be no cause of action for civil conspiracy to commit that act."

Goldstein v. Phillip Morris, Inc., 2004 PA Super 260, 854 A.2d 585, 590 (Pa. Super. Ct.

2004).

---

Id. at 384. Integrated Waste Solutions, Inc. v. Goverdhanam also looked at the relationship between the parties in determining that the gist of the action doctrine barred a tort claim against the defendant despite the fact that he was not a party to the contract at issue. Integrated Waste Solutions, No. 10-2155, 2010 U.S. Dist. LEXIS 127192, 2010 WL 4910176, at *1 (E.D. Pa. Nov. 30, 2010). The Court stated in relevant part:

> Here, Goverdhanam clearly acted as his own company's chief negotiator, and his misrepresentations were based on his intent (or lack thereof) to comply with, or have his company comply with, the terms of the Confidentiality Agreement and subsequent service contract. . . . Given that the alleged contracts between the parties governed the subject matter of Defendant Goverdhanam's purported misrepresentations, Goverdhanam's lack of contractual relationship with Plaintiff does not preclude the Court's application of the gist of the action doctrine.

Id. at 12.

[22] Indeed, courts in this district have shown some reluctance to dismiss claims for fraud in the inducement or negligent misrepresentation early in the litigation. See, e.g., Longview Dev. LP v. Great Atl. & Pac. Tea Co., Inc., No. CIV.A.02-7422, 2004 U.S. Dist. LEXIS 13977, 2004 WL 1622032, at *4 (E.D. Pa. 2004); Little Souls, Inc. v. State Auto Mut. Ins. Co., No. CIV.A.03-5722, 2004 U.S. Dist. LEXIS 4569, 2004 WL 503538, at *3 (E.D. Pa. March 15, 2004); Weber Display & Packaging v. Providence Wash. Ins. Co., No. CIV.A.02-7792, 2003 U.S. Dist. LEXIS 2187, 2003 WL 329141, at *4 (E.D. Pa. Feb. 10, 2003); Foster v. Northwestern Mut. Life, No. CIV.A.02-2211, 2002 U.S. Dist. LEXIS 15078, 2002 WL 31991114, at *3 (E.D. Pa. July 26, 2002).

Spring Hills claims that Third Party Plaintiffs have not properly pleaded a conspiracy claim because they have not identified an underlying cause of action under which to sue in the first place. Additionally, Spring Hill argues that Claudia offers no factual support for the conspiracy allegation because Claudia does not sufficiently allege when, how, where, or why the alleged plot to defraud Claudia was hatched or commenced nor does Claudia sufficiently define the scope or object of the alleged conspiracy. Spring Hill also argues that Claudia does not sufficiently define Spring Hill's role in the alleged conspiracy of overcharging CAM.

Claudia argues that it sufficiently pleaded its claim for fraud and, thus, must be permitted to proceed on the conspiracy count. Claudia argues that Dunkin' and Spring Hill acted together to defraud the Marottas by over charging them on their pro rata share of the CAM expenses and by requiring them to pay improperly assessed taxes and capital expenditures without an opportunity to object or question these expenses. The overt act was the statement of square footage, which resulted in monetary damage. Because the court finds that Claudia has adequately stated a claim for an underlying cause of action, at this stage, Spring Hill's argument is moot. Further, I find that Claudia has alleged sufficient facts to proceed on the conspiracy claim at this stage of the proceedings. When Plaintiff alleges civil conspiracy based on an underlying state law tort claim, "[p]laintiffs are not required to set forth a time and place for a conspiratorial meeting or a date upon which the conspiracy began." See L.C. v. Central Pa. Youth Ballet, 2010 U.S. Dist. LEXIS 66060, 2010 WL 2650640, *7 (M.D. Pa. July 2, 2010) (referencing Baker v. Rangos, 324 A.2d 498 (Pa. Super. Ct. 1974)). Claudia alleges that Spring Hill colluded

with Dunkin' to mislead Claudia as to the square footage of the building and overcharge

CAM expenses knowing that the square footage was false. Although I find Claudia's

assertions minimally passing what is required under Rule 8(a), I find that the contractual

relationship between Spring Hill and Dunkin' allows a reasonable inference that Spring

Hill and Dunkin' engaged in the underlying unlawful acts alleged by virtue of an

agreement. See generally Iqbal, 129 S.Ct. at 1949. In light of the liberal pleading

requirement of Rule 8 of the Federal Rules of Civil Procedure and the early stage of

litigation, Claudia sufficiently puts Spring Hill on notice of the nature of its civil

conspiracy claim under Pennsylvania law.

D. Count VII: Tortious Interference with Contract

To prove intentional interference with contractual relations under Pennsylvania

law, a plaintiff must show: (1) the existence of a contractual, or prospective contractual

relation between the plaintiff and a third party;[23] (2) purposeful action on the part of the

defendant, specifically intended to harm the existing relation, or to prevent the

prospective relation from occurring; (3) the absence of a privilege or justification on the

part of the defendant; and (4) the occasioning of actual legal damage as a result of the

defendants' conduct.[24] Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494,

530 (3d Cir. 1998); Pelagatti v. Cohen, 536 A.2d 1337, 1343 (Pa. Super. Ct. 1987)).

---

[23] In order to plead an intentional interference claim, the plaintiff must identify three parties — two contracting parties and an interfering party. Reading Radio, Inc. v. Fink, 2003 PA Super 353, 833 A.2d 199, at 210 (Pa. Super. Ct. 2003) (setting for elements of intentional interference claim).

[24] There is an additional element that pertains only to prospective contracts. See Brokerage Concepts v. U.S. Healthcare, Inc., 140 F.3d 494, 530 (3d Cir. 1998) ("for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the interference. . ."). Because Claudia claims Spring Hill interfered with a preexisting contract, this element is irrelevant here.

Claudia argues that it has a contractual relationship with Dunkin' through the franchise agreement that is being damaged by Spring Hill's actions. Claudia argues these actions have directly impacted the relationship between Dunkin' and Claudia resulting in the termination of the franchise agreement. By refusing to abide by the terms of the Prime Lease in good faith, Spring Hill has caused a rift, resulting in the termination of the franchise agreement.

Spring Hill argues that there are no facts alleged that would demonstrate "purposeful action" on the part of Spring Hill "intended to harm the relationship" between Claudia and Spring Hill. Spring Hill contends that even if Claudia's allegations regarding intentional misrepresentations in the Lease were true, it is difficult to see how those alleged misrepresentations could have been made for the purpose of intending to harm a  contractual relationship between Dunkin' and Claudia that did not yet exist.

Although I am skeptical about Claudia's ability to prove that Spring Hill engaged in purposeful action specifically intended to harm the existing relationship between Dunkin' and Claudia, I will not dismiss the claim at this stage of the proceedings. Because Claudia has alleged sufficient facts to plead a fraud claim against Spring Hill regarding its misrepresentation of square footage and its subsequent miscalculation of CAM expenses and other charges, the tortious interference claim will overlap considerably with any facts supporting the fraud claim. Further, the parties have failed to cite any persuasive case law throughout their briefings, which would tend to show whether the allegations pleaded by Claudia would typically survive or fail to survive a motion to dismiss. Therefore, I will deny Spring Hill's motion to dismiss Count VII.

E. Count VIII: Tortious Interference with Prospective Business Advantage

Claudia also alleges tortious interference with prospective contracts. The only difference between a tortious interference with prospective economic advantage claim and a tortious interference with contractual relations claim is simply the existence of a contract. See, e.g., Coast Cities Truck Sales, Inc. v. Navistar Intern. Transp. Co., 912 F. Supp. 747, 772 (D.N.J. 1995). Under Pennsylvania law, the elements of this claim are: (1) a prospective contractual relation, (2) the purpose or intent to harm the plaintiff by preventing the relation from occurring, (3) the absence of privilege or justification, and (4) actual harm or damage. Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 471 (Pa. 1979).

A prospective contractual relation is "something less than a contractual right, something more than a mere hope." Id. Plaintiffs must establish a "reasonable likelihood or probability" that a contractual relation would have occurred. Tose v. First Pennsylvania Bank, N.A., 648 F.2d 879, 898 (3d Cir. 1981). Claudia cannot show the existence of a prospective contractual relationship because there was an actual contract between the parties, not a prospective one. Thus, Spring Hill's motion to dismiss Count VIII will be granted.

**V.    Conclusion**

For the reasons stated above, I will grant in part and deny in part Spring Hill's Motion to Dismiss the Amended Third Party Complaint.

An appropriate Order follows.