**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DUNKIN' DONUTS FRANCHISING, LLC,** | : | |
| **et al.,** | : | **CIVIL ACTION** |
| **Plaintiffs,** | : | |
| | : | **No. 12-cv-2010** |
| **v.** | : | |
| | : | |
| **CLAUDI A I, LLC, et al.,** | : | |
| **Defendants.** | : | |
| | : | |
| ***and*** | : | |
| | : | |
| **CLAUDI A I, LLC, et al.,** | : | |
| **Third Party Plaintiffs** | : | |
| **v.** | : | |
| | : | |
| **SPRING HILL REALTY, INC., et al.,** | : | |
| **Third Party Defendants** | : | |

**MEMORANDUM**

**McHugh, J.**                                            **October 20, 2014**

**Introduction**

This case concerns a dispute involving a commercial property owner and management company, a national franchise network, and one of the network's independent franchisees. For a short while, at least, the parties' well-laid plans performed as intended. However, over time small disputes over property measurements and taxes rolled into larger problems with profits and costs, eventually eroding the parties' relationship. The franchisee—whether in protest against the property owner landlord, or as an ill-fated bargaining strategy—ceased paying rent or franchise fees, and the enterprise dissolved into litigation.

Plaintiff Dunkin', as franchisor, filed this lawsuit seeking rent and other costs from its franchisee Claudia I. It also asked for an injunction, claiming the franchisee was infringing its trademarks by continuing to operate an unauthorized franchise. Claudia I in turn joined Spring Hill, Inc., the owner of the property where its shop was located, accusing both Dunkin' and Spring Hill of inflicting mortal injury on the franchisee's business. This court, acting through Judge Stengel, granted a preliminary injunction against the franchisee in May 2013, and the franchise closed.

The parties came before me for a bench trial in July of 2014. Having heard testimony over two days, reviewed the parties' documentary evidence, received proposed findings of fact, and examined the relevant law, I find in favor of plaintiff Dunkin' for the reasons that follow.

**Parties**

Plaintiffs—Dunkin' Donuts Franchised Restaurants, LLC; DD IP Holder LLC, Baskin-Robbins Franchised Restaurants LLC, and DB Real Estate Assets I, LLC (hereinafter, 'Dunkin')—are a constellation of corporate entities that operate a massive and well-known franchise network of shops selling coffee, donuts, ice cream, and other food products. Plaintiffs own intellectual property for the business, control real estate, manage franchises, and perform other functions. Plaintiffs license independent business owners to use the Dunkin' brand and other intellectual property and to sell Dunkin' products. These independent businesses, known as 'franchisees,' agree to pay fees to Dunkin', called the 'franchisor', and abide by Dunkin's rules about the operation of the business.

The defendants, counterclaimants, and third party plaintiffs are a Dunkin' franchisee and the franchisee's owners. Manfred P. Marotta and Lynne K. Marotta co-own Claudia I, LLC.

(hereinafter, 'Claudia I'). The Marottas own two other franchisees, one of which is the subject of related litigation before this court. *Dunkin' v. Claudia III*, No. 2:14-cv-2293-GAM.

Third-party defendant, Spring Hill Inc., owns and manages several commercial properties in Pennsylvania. Its holdings include the shopping center in Jenkintown, Pennsylvania where Claudia I operated its Dunkin' franchise (hereinafter, 'Spring Hill').

The shop at 505 Old York Road, Jenkintown, Pennsylvania is such an important character in this dispute that it is helpful to describe it now, before descending into the somewhat tangled timeline of events. The shop is part of a shopping center which Spring Hill owns and manages. A real estate arm of Dunkin' leased the store from Spring Hill in 2002. Dunkin' converted it to a Dunkin' Donuts and Baskin Robbins shop. The shop has a basement and a ground floor, and there are offices on a second floor above that Dunkin' does not lease. The shop faces Old York Road and has both high visibility and significant vehicle traffic, along with parking. The exact size of the space is a fact the parties dispute. The original lease gave a figure of 3,100 sq. ft. for the ground floor ad 1,500 sq. ft. for the basement. The size of the ground floor was revised to 3,152 sq. ft. in April 2002, and revised again to 3,167 sq. ft. in October 2002. Exhibit D-2. Other measurements, part of the dispute between the parties, are discussed below.

## General Findings of Fact[1]

*The Franchise Agreement*

1. The Marottas completed an agreement with Dunkin' to take over three Philadelphia area Dunkin' franchises on July 16, 2009.

---

[1] In addition to these baseline findings detailing the history of this dispute, further evidence with respect to specific issues is reviewed below in the analysis of claims.

2. The Marottas arranged to operate each franchise through a separate LLC. Claudia I became the franchisee for the Jenkintown store. Claudia I signed a franchise agreement with Dunkin' detailing the rights and obligations of all parties. Because Dunkin' already leased the store from Spring Hill, Claudia I also agreed to sublease the store from Dunkin'.

3. As franchisees, Claudia I agreed to remit monthly dues to Dunkin', sell Dunkin' products, including Baskin Robbins ice cream, and abide by certain rules related to the operation of their donut shop.

4. Subject to those rules, the franchise agreement gave authority over the day-to-day operation of the store to Claudia I. Exhibit D-1.

5. In the agreement, Dunkin' promised to "maintain a continuing advisory relationship with [the owner], providing such assistance as we deem appropriate regarding the development and operation of the Store." Exhibit D-1.

6. The franchise agreement also contained disclaimers that Dunkin' did not guarantee the success of the store. For instance, paragraph 16.7 cautioned:

> 16.7 Your success in this business is speculative and depends, to an important extent, upon your ability as an independent business owner. We do not represent or warrant that the Store will achieve a certain level of sales or will be profitable, notwithstanding approval of the location. By your signature below, you acknowledge that you have entered into this Agreement after making an independent investigation of the Dunkin' Donuts and Baskin-Robbins Systems.

7. As subtenants, Claudia I also agreed to pay a monthly amount to Dunkin' that combined the rent Dunkin' owed to Spring Hill with additional fees.

8. The base rent was $8,750 per month prior to 2013, and rose to $9,583.22, or approximately $114,000 per year. Exhibit P-4.

9. Additional fees included taxes and a charge to reimburse Dunkin' for the cost of building out the original store.

10. Another set of fees, called Common Area Maintenance ('CAM'), were charged by Spring Hill and passed through Dunkin' to Claudia I. The CAM fees reimbursed Spring Hill for certain expenses related to maintaining the shopping center. For example, CAM fees included minor maintenance work. According to the Prime Lease between Spring Hill and Dunkin' and the Sublease between Dunkin' and Claudia I, Claudia I was responsible for a share of the shopping center's total CAM costs that was proportional to the square footage that Claudia I occupied.

11. When signing the sublease, Mr. Marotta suspected that the documents overstated the square footage of the store and that Spring Hill would charge excessive CAM fees. Testimony of Mr. Marotta, July 21, 114:7–9.[2] Nonetheless Mr. Marotta signed the documents.

12. Claudia I began operating its Dunkin' Donuts store, but before long, difficulties became apparent.

*Problems with Store Performance*

13. The store was underperforming. While other Dunkin' franchises in the area were experiencing an 'upward sales trend', Claudia I's store had a downward trend. P-16.

14. At trial, Mr. Marotta offered various reasons for the bad performance of the store.

---

[2] This Court held a bench trial over July 21 and 22, 2014. Citations to the bench trial transcript have the following format:
Testimony of [witness], [day of trial], [beginning page in transcript]:[beginning line]–[ending page in transcript, if different]:[ending line].

15. He testified that Spring Hill was neglecting the physical upkeep of the property. He recalled that the parking lot was dirty, sidewalks were not power-washed or steam cleaned and had black stains, stucco on building walls was cracked, wood trim around windows was rotten, the basement door had a two-inch gap at the bottom, and a retaining wall that had been hit by a car was fixed a year after the damage. Testimony of Mr. Marotta, 65:9–66:23.

16. He also asserted that his rent was too high. Mr. Marotta told the court that Claudia I paid around $34 per sq. ft. to Spring Hill, but Spring Hill advertised other space for $17–$22 per sq. ft. Exhibit D-11; Testimony of Mr. Marotta, July 21, 98:18–99:17.

17. Another of Mr. Marotta's complaints asserted that Spring Hill and Dunkin' had overstated the size of the store and were overcharging Claudia I's common area maintenance (CAM) fees. Spring Hill disagreed that it overstated the size of the store. Spring Hill's President, Mr. Orloski, explained that the company always measures its properties from the outside wall. Testimony of Mr. Orloski, July 22, 89:21–91:12.

18. Dunkin' describes Mr. Marotta's problems with the store differently.

19. Karen Turner, the operations manager assigned to Claudia I, visited the store to review its operations. She testified at trial about several problems with Claudia I's operations, including poor staffing and low food quality. Testimony of Ms. Turner, July 21, 191:11–192:2. According to Ms. Turner, Claudia I paid too much overtime and the crew was improperly trained. Testimony of Ms. Turner, July 21, 207:13–20. Ms. Turner also testified that Claudia I should have taken care of overfull trash cans and dirty sidewalks outside the store. Testimony of Ms. Turner, July 21, 202:21–203:10.

20. Dunkin' also had reason to be concerned that Mr. Marotta had larger problems than one underperforming shop.

21. Dunkin' heard from Mr. Marotta that he could not pay his debts. Exhibit P-2.

22. At one point, Mr. Marotta told Ms. Turner that he was paying Dunkin' by not paying taxes owed, Testimony of Ms. Turner, July 21, 196:20–197:4, a revelation that deeply concerned Ms. Turner.

23. By December 31, 2012, Claudia I had unpaid sales tax and payroll liabilities of over $300,000. Exhibit P-7; Testimony of at 68/17–69.

24. Pennsylvania had filed tax liens against Claudia I for unpaid taxes from 2010 through 2012. Exhibit P-8.

*Attempts to Fix the Problems*

25. Mr. Marotta testified he tried to resolve the problems with his Jenkintown store by communicating with both Spring Hill and Dunkin'.

26. Mr. Marotta recalls discussing relocating his franchise with Dunkin. Testimony of Mr. Marotta, July 21, 95:3–13.

27. Mr. Marotta testified he had a meeting with Dunkin' staff about his CAM charges and Spring Hill's upkeep of the property in May 2011. Testimony of Mr. Marotta, July 21, 87:5–11.

28. Mr. Marotta hired an accountant to audit the CAM charges. Testimony of Mr. Marotta, July 21, 115:5–116/25; Exhibit D-4.

29. Emails sent during the spring of 2011 show that Dunkin' recognized Claudia I's problems with the landlord. For instance, in a message sent March 21, 2011, a Dunkin' employee wrote, "this might be a good one for a rent reduction effort. Our

lease expires 12/31/2012 with renewal options. The Field/Franchisee want to move.
Dug. Adolphe is checking on our [Book Value]. The prime rent needs to be in the
$70,000 range for this location to work." Exhibit D-7.

30. In response to the various concerns, Dunkin' did not relocate Claudia I, but it
negotiated a reduced rent with Spring Hill. Testimony of Mr. Orloski, July 22, 104:4–
105:23; Exhibit D-9.

31. However, the lease modification proposed also required Mr. Marotta to give up any
claims he might have against Dunkin' and Spring Hill. Testimony of Mr. Marotta,
July 21, 197:12–15.

32. Mr. Marotta refused to accept the revised lease.

33. Dunkin' also sent Karen Turner, the operations manager assigned to Claudia I, to
advise Claudia I on improving its performance. Testimony of Ms. Turner, July 21,
187:13–188:23. Ms. Turner gave testimony I found credible about problems in the
operation of the store, including staffing problems, unrelated to any problem with the
physical space.

*Rent Strike*

34. Claudia I began withholding base rent and CAM from Dunkin' in November 2011.
Exhibit P-8.

35. Although withholding rent, Claudia I continued to operate the Dunkin' Donuts shop.

36. According to Mr. Marotta, withholding rent was his last option for protesting the
excessive rent, CAM overcharges, and poor facilities upkeep. Testimony of Mr.
Marotta, 69:8–25, 79–81:19; Exhibit D-5.

37. Accordingly to Spring Hill, the rent strike was a negotiating strategy, based on the following exchange with Mr. Marotta at deposition: "because the store was not performing, you made the determination that you were going to attack the lease in the sense that you were going to try to bring your rent and CAM costs down?" Mr. Marotta answered, "Exactly." Testimony of Mr. Marotta (reading from Mr. Marotta's deposition), July 21, 139:21–140:1.

38. The rent due was not reserved or escrowed by Claudia I; it simply was not paid.

39. Claudia I also did not meet a deadline in the Franchise Agreement to remodel the Dunkin' store. Explaining his decision not to remodel, Mr. Marotta said in his deposition that "We felt like the issues with the upkeep of the building at Jenkintown was insurmountable. The footprint of the building was not remodel friendly." Testimony (reading from Mr. Marotta's Deposition), July 21, 30:20–22.

40. Dunkin' took the first steps to terminate Claudia I's franchise in May of 2012 by sending Claudia I a notice of default. Exhibit P-5.

41. Claudia I did not take the remedial actions demanded by Dunkin', and in April 2012, Dunkin' sent Claudia I a notice of termination of the franchise. Exhibit P-6.

42. Dunkin' also terminated Claudia I's sublease. Exhibit P-6.

43. After termination, Claudia I continued to operate the store, using the Dunkin' trademark.

44. Claudia I has not paid any rent or CAM since November 2011. The amount due to Dunkin' for rent, CAM, and real estate taxes is $221,224. Testimony of Mr. Zullig, Senior Collections Specialist at Dunkin', July 21, 14:17–15:14.

*Lawsuit is Filed*

45. Dunkin' filed this action in April 2012, and accused Claudia I of breach of the franchise agreement and sublease, trademark infringement, and unfair competition.

46. Dunkin' asked the court to issue a preliminary injunction against Claudia I, shutting down the Jenkintown store. Dunkin' also asked the court to enforce the restrictive covenant in the franchise agreement.

47. Claudia I's response included several counterclaims.

48. Claudia I also filed a third party complaint against Spring Hill.

49. Spring Hill and Dunkin' have asked for indemnity against each other.

50. The court granted Dunkin's request for a preliminary injunction on May 17, 2013. Doc. 71. The court also partially granted the plaintiffs' Motion for Summary Judgment of defendants' counterclaims. Doc. 88.

51. After the court issued the preliminary injunction, the Dunkin' shop at 505 Old York Road closed.[3]

52. Meanwhile the 505 Old York Road store remains closed, pending the resolution of a variety of entanglements including tax liens and this litigation.

53. The parties appeared before this court on July 21 and 22, 2014 for a bench trial on the merits of the case.

54. As of trial, Dunkin' seeks back rent, occupancy costs, counsel fees, interest and costs amounting to $374,063.23. Testimony of Mr. Zullig, July 21, 12:16–25. These amounts include "the lost royalties and advertising fees during the period from the time Claudia I closed pursuant to the preliminary injunction entered in this case and

---

[3] Dunkin' then licensed a new franchise at an alternative location Claudia I had proposed. Claudia I's contention that this is evidence of Dunkin' bad faith is addressed below in an evaluation of counter-claims.

the time Dunkin' re-established a location in the market." Dunkin's Proposed

Findings of Fact ¶ 45.

## Standard of Review

For the claims alleging contractual breaches, the burden of proof falls on the claimant. *E. Tex. Motor Freight, Diamond Div. v. Lloyd*, 484 A.2d 797, 801 (Pa. Super. Ct. 1984) ("The burden of proof in a contract action is upon the party alleging breach or default."). The claimant can only meet its burden by showing the 'preponderance of the evidence' supports its claims. *Snyder v. Gravell*, 666 A.2d 341, 343 (Pa. Super. Ct. 1995) ("[T]he party having the burden of proof in a contract matter must sustain it by a 'preponderance of the evidence'.") (citing *Ragnar Benson, Inc. v. Bethel Mart Assoc.*, 454 A.2d 599, 602 (Pa. Super. Ct. 1982)). The preponderance of the evidence standard requires the finder of fact to consider all the evidence and only find for the claimant if the evidence "as a whole shows that the fact sought to be proved is more probable than not." Third Circuit Model Jury Instructions 1.10, Comment (citing *United States v. Montague*, 40 F.3d 1251, 1254–55 (D.C. Cir. 1994)). For claims seeking damages, not only must the claimant prove the existence of damages, it must also "with a fair degree of probability establish a basis for the assessment of damages." *Spang & Co. v. U.S. Steel Corp.*, 519 Pa. 14, 27, 545 A.2d 861, 867 (1988); *Internazionale Graniti S.R.L. v. Monticello Granite Ltd.*, 2009 WL 2461803, at *1 (E.D. Pa. 2009).

Trademark infringement claims ordinarily require a similar standard of proof from the claimant. The movant must prove the existence of a protected mark and then "show by a preponderance of the evidence that [the contested mark] created a likelihood of either direct or reverse confusion with [the protected trademark]." *A & H Sportswear, Inc. v. Victoria's Secret*

*Stores, Inc.*, 237 F.3d 198, 207 (3d Cir. 2000). However as discussed below, the analysis is slightly different when a dispute involves a terminated franchise agreement.

Before analyzing each of the claims, counterclaims, and crossclaims in the litigation, I offer the following overview based upon my review of the evidence. As a general matter, I am not persuaded that any defect in the premises or the management of the shopping center would suffice to explain the extent of problems with performance encountered by Claudia I. I also fail to see how the various disputes Claudia I had with Dunkin' and Spring Hill would support a legal right to stop paying franchise fees or rent. I do not discount the sincerity of Mr. Marotta as he related the various challenges faced by his business, but find that his intense focus on some of the comparatively minor problems that affected the success of the venture kept him from comprehending far more fundamental issues that he faced. In particular, in evaluating whether Dunkin' responded fairly to the struggles this franchise was encountering, I am impressed by Dunkin's efforts to renegotiate a lower rent more in line with the operational history of the site. Against that broad overview of my sense of the evidence, I address each one of the claims and counterclaims individually.

**Plaintiffs' Claims – Analysis and Conclusions of Law**

1. Breach of Franchise Agreement and Sublease

I find in favor of the Dunkin' plaintiffs as to the breach of both agreements. Claudia I stopped paying rent due to Dunkin' in November 2011. Claudia I has not offered evidence or a legal theory under which it would be excused from paying rent. An unexcused failure to pay rent is a clear breach of this sublease. *See Village Beer & Beverage, Inc. v. Vernon D. Cox & Co., Inc.*, 475 A.2d 117, 121 (Pa. Super. Ct. 1984) ("A lease is in the nature of a contract and is controlled by principles of contract law"). The Pennsylvania court in *Village Beer* found that a

lease clearly called for monthly rent and clearly explained remedies for the lessor if the lessee failed to deliver the rent. The court then explained that in the absence of any provisions to change the rent requirement, the lessee's failure to pay "absolutely acts as a breach giving [lessors] the option to treat the lease as void." *Village Beer*, 475 A.2d. at 121.

The sublease between Dunkin' and Claudia I is similarly clear. A failure to pay rent is a default: "The Tenant shall be in default under this Lease: If Tenant fails, refuses or neglects to pay promptly to Landlord any monies owing to Landlord on the date such payment is due." Exhibit P-4, ¶ 18(b)(1). A default not cured within ten days allows the landlord to terminate the Lease: "If Tenant shall be in default under Paragraph 18(b)(1) of this Lease and such default shall not be cured within ten (10) days after receipts of a written notice to cure thereof from Landlord, then, in addition to all other remedies at law or in equity, Landlord may immediately terminate this Lease." Exhibit P-4 ¶ 18(d). The lease then defines the landlord's remedy upon termination: "Upon any termination of this Lease … Tenant will indemnify Landlord against all loss or damage suffered by reason of the termination, including loss of rentals which would have otherwise been payable hereunder for the balance of the term had such termination not occurred and all costs of reletting the Premises." Exhibit P-4 ¶ 18(e).

Dunkin' sent a notice to cure on March 21, 2012, a notice of termination of the franchise agreement and sublease on April 4, 2012, and a supplemental notice on June 8, 2012. As of trial, Claudia I had still not paid the back rent, accumulating more than $200,000 in back rent, real estate taxes, and CAM charges. The sublease was undeniably breached.

The breach of the sublease also breached the franchise agreement. Section 3 of the Franchise Agreement states, "If you lose the use and enjoyment of the premises before the end of the Term, this Agreement will automatically terminate without further notice." Exhibit P-3 § 3, ¶

3.0. Section 14 explains that the franchisee is in default if it breaches "an obligation under another agreement, which agreement is necessary to the operation of the store." Exhibit P-3 § 14, ¶ 14.0.1. There is no cure period if the franchisee's lease is terminated. Exhibit P-3 § 14, ¶ 14.2.

Claudia I also breached the franchise agreement by failure to pay franchise and advertising fees. Failure to pay advertising costs leads to a default under the Franchise Agreement if not cured within seven days of notice. Exhibit P-3 § 14, ¶ 14.1.2.

Dunkin' further contends that Claudia I breached the franchise agreement by failing to disclose certain information when Mr. Marotta signed the original agreement, including a history of bankruptcy, the amount of money he borrowed to finance the purchase of the franchise, and other facts. I am skeptical about the relevance of these arguments, but because I find Claudia I did breach its contracts with Dunkin', I give them no weight.

Part of Dunkin' claim is that Claudia I violated the lease by failing to remodel the store on schedule. Claudia I responds that Dunkin' allowed the remodel to be postponed. Testimony of Mr. Mack, July 22, 16:24–17:3. Whether this is correct is immaterial, because Claudia I breached its contract in more important respects besides the remodel.

*Dunkin's Damages from the Breach:*

Dunkin' is entitled to recover damages resulting from the breach of the Franchise Agreement and sublease. Pennsylvania courts have cited to the articulation of damages for breach of contract in the Restatement (Second) of Contracts § 347:

> Subject to the limitations stated in §§ 350–53, the injured party has a right to damages based on his expectation interest as measured by
> (a)    the loss in the value to him of the other party's performance caused by its failure or deficiency, plus
> (b)    any other loss, including incidental or consequential loss, caused by the breach, less
> (c)    any cost or other loss that he has avoided by not having to perform.

*Douglass v. Licciardi Const. Co.*, 386 Pa. Super. 292, 295, 562 A.2d 913, 915 (1989).

Dunkin' offered the following calculation of damages at trial:

| | |
|---|---|
| May '13 Franchise and Advertising Fees — Dunkin' Donuts | $ 1,348.75 |
| May '13 Franchise and Advertising Fees — Baskin Robbins | $ 228.10 |
| Rent/CAM/Real Estate Taxes | $221,224.27 |
| Legal Fees | $151,162.11 |
| NSF Fees (for bounced payments) | $ 100.00 |
| TOTAL: | $374,063.23 |

Exhibit P-8A; *see also* Testimony of Mr. Zullig, July 21, 11:21–15:14.

The Franchise and Advertising Fees, Rent/CAM/Real Estate Taxes, and NSF fees were all losses directly caused by Claudia I's decision to stop paying Franchise and Advertising Fees, Rent, CAM, and Real Estate Taxes. Both the franchise agreement and the sublease between Dunkin' and Claudia I require the franchisee/sublessee to provide reasonable costs and attorney fees caused by the franchisee's/sublessee's breach. Exhibit 3 ¶ 14.4.4; Exhibit D-4 ¶ 18(c).

I find the calculations credible. I note, however, that P-8A claims rent during 2013 at a monthly rate of $9,583.33, when in fact the Fifth and Sixth Amendments to the Prime Lease reduce monthly rent to $7,548.02. Dunkin' calculations include five months into 2013, and I will reduce the damages awarded by $10,176.55.

With respect to counsel fees, although I hold that Claudia I is responsible, Plaintiffs are directed to supplement the record with documentation of the fees claimed, which Defendants shall be given the opportunity to review and challenge.

Claudia I offers two arguments to mitigate the damages that Dunkin' is claiming. First, it argues that Dunkin' has not suffered any damages as a result of Claudia I's actions. According to

this argument, if Dunkin' had relocated Claudia I, Claudia I would not have stopped paying rent and Dunkin' would not have incurred attorneys' fees in this action. I reject this argument because, under the applicable agreements, Dunkin' was not required to relocate Claudia I to an alternative site. Furthermore, Dunkin' took steps to renegotiate the lease. The tenability of relocation as a solution is analyzed further in the consideration of Claudia I's counterclaims below.

Claudia I argues in the alternative that Dunkin' has failed to mitigate any damages it may have suffered. Although Claudia I is correct that general contract law imposes a duty to mitigate on the non-breaching party, the Pennsylvania Supreme Court has held that landlords in commercial leases do not have a duty to mitigate when a commercial tenant ceases paying rent. *Stonehedge Square Ltd. Partnership v. Movie Merchants, Inc.*, 552 Pa. 412, 715 A.2d 1082 (1998). With respect to the franchise agreement, Dunkin' has in fact mitigated damages by entering into a new franchise relationship, and the amount of money sought as damages, less than $2000 in total, demonstrates that Dunkin' seeks to recover lost franchise fees for a limited and reasonable period of time. The burden of proof on failure to mitigate rests with the breaching party. *Portside Investors, L.P. v. Northern Ins. Co. of New York*, 41 A.3d 1, 15 (Pa. Super. Ct. 2011) ("The burden to prove this duty to mitigate is placed on the party who actually breaches the contract."). Claudia I has not demonstrated such a failure on plaintiffs' part.

To conclude the discussion of Dunkin's damages for Claudia I's breach of contract, I find that Dunkin' is entitled to its full calculation of $374,063.23 less $10, 176.55 and setting aside attorneys' fees until further proceedings: $212,724.57.

2. Trademark Infringement Under § 32 and Unfair Competition Under the § 43 of the Lanham Act

I find that Claudia I has infringed Dunkin's registered trademarks, and that its continued use of Dunkin's trade dress constitutes unfair competition.

Section 32 of the Lanham Act provides that a person or entity who uses in commerce a registered trademark in a way that is "likely to cause confusion, or to cause mistake, or to deceive" is liable to the owner of the mark. 15 U.S.C. § 1114(1). Once a franchisor properly terminates a franchise agreement, the license to use the franchisor's trademarks terminates as well. *S & R Corp. v. Jiffy Lube*, 968 F.2d 371, 379 (3d Cir. 1992); *7-Eleven, Inc. v. Upadhyaya*, 926 F. Supp. 2d 614, 626 (E.D. Pa. 2013). Continued post-termination use of trademarks by a former franchisee satisfies the requirements of trademark infringement under the Lanham Act. *S & R Corp.*, 968 F.2d at 375 (holding that because franchisee defendant was using the franchisor plaintiff's mark, "there is no question … that their concurrent use is highly likely to cause consumer confusion.") (citing *Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187,192 (3d Cir. 1990)).

Dunkin' terminated Claudia I's franchise agreement in April, 2012. After termination, Claudia I continued to operate the store. Claudia I operated the store until the court issued a preliminary injunction ordering Claudia I to cease. Order Granting Plaintiffs' Motion for Preliminary Injunction, Doc. 71 (May 17, 2013). Therefore, during the time period after termination soon after April 4, 2012 and until Claudia I actually closed, Claudia I was infringing Dunkin's trademarks.

Section 45 of the Lanham Act provides that any person who, "in connection with any goods or services … uses in commerce any word, term, name, symbol, or device" likely to cause confusion about the origins of the goods or services, or misrepresents characteristics of the goods is liable to the person harmed. 45 U.S.C. § 1125. The section prohibits a person or business from

using a competitor's distinctive words, symbols, or other devices in a way that is likely to confuse the public about the origin of products or services being sold. As with the trademarks, Claudia I's continued use of Dunkin's trade dress following termination of the franchise agreement constitutes unfair competition.

Dunkin' seeks no damages for these violations, and in fact represents in its proposed findings of fact that "no monetary award will adequately compensate plaintiffs because Claudia I does not have sufficient funds to pay a monetary award." Dunkin's Proposed Findings of Fact at 22. For the reasons set forth below I conclude that Dunkin' is entitled to injunctive relief.

3. Issuance of permanent injunction

The Third Circuit has set out the standard for a request for a permanent injunction:

In deciding whether to grant a permanent injunction, the district court must consider whether:
(1) the moving party has shown actual success on the merits;
(2) the moving party will be irreparably injured by the denial of injunctive relief;
(3) the granting of the permanent injunction will result in even greater harm to the defendant; and
(4) the injunction would be in the public interest.

*Gucci Am., Inc. v. Daffy's Inc.*, 354 F.3d 228, 236–37 (3d Cir. 2003).

Dunkin' has satisfied these requirements. First, Dunkin' has demonstrated success on the merits of its trademark infringement claim. Second, Dunkin' has demonstrated that it would be irreparably harmed without injunctive relief. Without an injunction, Claudia I could in theory indefinitely operate its Dunkin' store, taking advantage of Dunkin's brand without adhering to Dunkin's standards or paying Dunkin' monies owed.

Balancing the equities, I readily find that granting the permanent injunction would not result in greater harm to Claudia I than Dunkin' would suffer without the injunction. The store has been closed for months, so making the preliminary injunction permanent would not impose a

new hardship on Claudia I. Furthermore, the terminated franchise agreement, invalidated sublease, and restrictive covenant prevent Claudia I from operating a Dunkin' Donuts or any similar establishment at that location. A permanent injunction prohibiting Claudia I from doing something it cannot do anyway is not an undue burden to Claudia I.

Finally, I find that the public interest weighs in favor of granting a permanent injunction. The public has a general interest in the enforcement of contractual obligations. *See MarbleLife, Inc., v. Stone Res., Inc.*, 759 F. Supp. 2d 552, 563 (E.D. Pa. 2010) (granting a preliminary injunction and explaining, "as this is in essence a breach of contract dispute, the public interest favors enforcing valid contracts and making parties live up to their agreements."); *Siemens Bldg. Techs., Inc. v. Camacho*, 168 F. Supp. 2d 425, 427–28 (E.D. Pa. 2001). Additionally, a permanent injunction will make it easier for Claudia I's former store, now sitting idle, to be repurposed and returned to active use.

4. Enforcement of the restrictive covenant

I will enforce the covenant limiting Claudia I's competition with Dunkin. Pennsylvania courts enforce restrictive covenants that meet three requirements:

> (1) it must relate to either a contract for the sale of goodwill or other subject property, or to a contract for employment; (2) it must be supported by adequate consideration; and (3) it must be reasonably limited in both time and territory.

*Ress v. Barent*, 548 A.2d 1259, 1262 (Pa. Super. Ct. 1988) (citing *Piercing Pagoda, Inc. v. Hoffner*, 465 Pa. 500, 507, 351 A.2d 207, 210 (1976)). With respect to covenants not to compete in the franchise context, Pennsylvania law "will permit equitable enforcement of a covenant not to compete included in a franchise agreement where the restrictions are reasonably necessary for the protection of the franchisor without imposing undue hardship on the franchisee and the

restrictions are reasonably limited as to duration of time and geographical extent." *Piercing*

*Pagoda, Inc.*, 465 Pa. at 510, 351 A.2d at 212.

> The Franchise Agreement contains the following covenant not to compete:
>
> For the first twenty-four months following the expiration or termination of this Agreement or transfer of an interest in the franchised business (the "Post-Term Period"), neither you nor any shareholder, member, partner, officer, director or guarantor of yours, or any person or entity who is in active concert or participation with you or who has a direct or indirect beneficial interest in the franchised business, may have any direct or indirect interest in, perform any activities for, provide any assistance to or receive any financial or other benefit from any business or venture that sells products that are the same as or substantially similar to those sold in Dunkin' Donuts or Baskin-Robbins stores and located within five (5) miles from the Store or any other Dunkin' Donuts or Baskin-Robbins store that is open or under development.

P-3 § 10, ¶ 10.2.

I find this covenant to be enforceable under Pennsylvania law. The franchise agreement is

a contract supported by consideration on both sides, and it relates to the sale of goodwill.

*Athlete's Foot Mktg. Assocs. V. Zell Inv., Inc.*, 2000 WL 426186, at *9-10 (W.D. Pa. Feb. 17,

2000) (upholding a franchise's covenant not to compete) (citing *Piercing Pagoda*, 351 A.2d at

210). Its time limitation of twenty four months is reasonably limited. The geographical scope—

"five miles from the Store or any other Dunkin' Donuts or Baskin-Robbins store that is open or

under development"—does give me some hesitation. Dunkin' operates throughout the United

States and has franchises abroad. *Boulanger v. Dunkin' Donuts, Inc.*, 442 Mass. 635, 644, 815

N.E.2d 572, 580 (2004). The covenant not to compete therefore seems to apply anywhere

Dunkin' operates worldwide. However the restriction's limit to a five mile radius, and the

absence of any other evidence before me that this covenant is unduly burdensome, lead me to the

conclusion that the covenant not to compete is reasonable and enforceable.

**Defendants' Remaining Crossclaims and Counterclaims[4] - Analysis and Conclusions of Law**

1. COUNT III: Breach of contract against Spring Hill and Dunkin' (Prime Lease and sublease)

I find in favor of Dunkin' and Spring Hill.

Claudia I's breach of contract claim asserts that Spring Hill failed to maintain the shopping center where Claudia I was located. Claudia I points out that Article 8.2 of the Prime Lease required Spring Hill to:

> (i) make all repairs and the necessary replacements to the structural portions of the Shopping Center and the Premises (including the skylights and trap doors), doors, storefront (excluding plate glass), floor slab, exterior walls, foundation, and footings, and (ii) replace the main lines for water, gas, sewer, wiring and utility connections and any mechanical or electrical systems or components that serve the Common Areas or more than one tenant space.

Mr. Marotta testified at trial that he observed dirty and unrepaired facilities, including cracks in the exterior stucco walls, rotting wooden trim, cracks in the parking lot, stains on the sidewalk, and a general atmosphere not in keeping with a first-class shopping center. Testimony of Mr. Marotta, July 21, 65:9–66:23.

Mr. Marotta asserted that he sought to draw Spring Hill's attention to the problems, but Spring Hill evaded him. Testimony of Mr. Marotta, July 21, 79:12–13. He also claimed that Dunkin' told him to deal with Dunkin' rather than directly with Spring Hill, but that Dunkin' also did not fix the problems. Testimony of Mr. Marotta, July 21, 77:1–8. From this Claudia I concludes that Dunkin' violated its obligations under the sublease (Claudia I's Proposed Findings of Fact ¶¶ 126–33) and Spring Hill violated obligations to Claudia I through the Prime Lease. Claudia I's Proposed Findings of Fact ¶¶ 126–33.

---

[4] Several counterclaims were dismissed by Judge Stengel's summary judgment decision of February 10, 2014.

On behalf of Spring Hill, Mr. Orloski, one of its principals, rebutted this testimony at trial. In some instances he outright denied the problem, *see* Testimony of Mr. Orloski, July 22, 86:21–87:3 (discussion of size of Dunkin' space); in others he maintained that Claudia I was responsible, *see* Testimony of Mr. Orloski, July 22, 93:21–94:13 (discussion of basement flooding); and he also testified to the need to keep rein on expenses when tenants like Claudia I would in turn complain about CAM charges, see Testimony of Mr. Orloski, July 22, 91:22–92:4 ("The tenants do complain about CAM costs, so you have to be careful how much money you spend on common-area maintenance, so you don't drive the tenants out of business by overspending and over-operating the property."). On balance, the witnesses fought to a draw, and as the party with the burden of proof, Claudia I's claim falls short. More pertinently, however, nothing in the record about Spring Hill's failings would explain Claudia I's business failure. At most, any deficits in Spring Hill's performance would have affected Claudia I around the edges, and Claudia I has not quantified a major economic impact preventing its business success.

Claudia I's next claim, that Spring Hill breached the Prime Lease, posits that Spring Hill overcharged CAM fees to Dunkin, which then passed the excessive fees to Claudia I. Claudia I's Proposed Findings of Fact ¶¶ 134–197. Claudia I challenges several specific CAM fees.

First, Claudia I claims the square footage was improperly calculated, resulting in excessive CAM charges. Under the lease, CAM charges were to be calculated as follows: "Tenant's pro-rata share of Common Area Maintenance Expenses shall be calculated by multiplying the Common Area Maintenance Expenses by a fraction, the numerator of which shall be the square footage of the Premises exclusive of the basement, and the denominator of which is the Landlord's Floor Area." Exhibit D-2 ¶ 17.2(a). The Prime Lease states that the landlord's floor area is 29,384 sq. ft., and the tenant's floor area, exclusive of the basement, is

listed as 3,100 sq. ft.. Exhibit D-2 ¶ 1. Claudia I's pro-rata share was to be the fraction, 3,100 over 29,384, which equals 0.1055, or about 10% of Spring Hill's total CAM charges. A letter from Dunkin' to Spring Hill on April 17, 2002 revised the ground floor space to 3,152 sq. ft., which increased Claudia I's pro rata share slightly to 0.1073. Dunkin' enlarged the number again to 3,167 sq. ft. when it expanded the size of its store. Testimony of Mr. Orloski, July 22, 107:8–18. Then Spring Hill revised the landlord's square footage to 30,094 sq. ft. on December 8, 2011. Exhibit D-4.[5]

A dispute emerged about how the tenant's square footage should be calculated. The lease is silent on the method. At trial, Spring Hill's president testified that Spring Hill calculates the square footage of its interior spaces by measuring buildings' outside walls. Testimony of Mr. Orloski, July 22, 81:19–25. Dunkin's Mr. Mack testified that the appropriate way to measure interior spaces is from the center line of the walls. Claudia I hired its own surveyor to calculate the size of the store, who seems to have measured from the inside of the walls, and found the store to be only 2,782 sq. ft. Exhibit D-4.[6] Thus the best case CAM rate for Claudia I would employ the surveyor's measurement and Spring Hill's revised measurement; 2,782 divided by 30,094 equals 0.093.

The court will take judicial notice that even calculating the size of a room can be difficult to pin down when lawyers get involved. Nonetheless, Claudia I has failed to carry its burden of proof that any particular value more favorable to Claudia I than the rate Spring Hill charged is the correct value under the Prime Lease. Spring Hill calculated square footage one way; Dunkin' typically employs another; and Claudia I at some point proposed a third method. The lease does

---

[5] Ironically, increasing the landlord's square footage would decrease each tenant's proportionate share.
[6] Given the Court's resolution of this point, Defendants' hearsay objection is moot.

not specify any particular method, and Dunkin' and Claudia I paid for some time according to the calculation that Spring Hill employed. Parties' conduct under an agreement is probative of the parties' understanding of what their obligations are and what unclear terms mean. *Pa. Eng'g Corp. v. McGraw-Edison Co.*, 500 Pa. 605, 612, 459 A.2d 329, 332 (1983) ("course of performance is always relevant in interpreting a writing") (citing *Atl. Richfield Co. v. Razumic*, 480 Pa. 366, 376 n.6, 390 A.2d 736 n.6 (1978)) I cannot conclude from the evidence presented that the Prime Lease requires any method other than the one actually used. Even assuming a different method, the differential is modest, and not sufficient to cause the failure of Claudia I's business.

Second, Claudia I argues that Spring Hill improperly included the Business Privilege Tax as a CAM fee. Claudia I's Proposed Findings of Fact ¶¶ 198–225. The Prime Lease provides that Spring Hill may distribute certain taxes to its tenant as part of the CAM fees. Paragraph 7.1 of the Prime Lease explains that the landlord will pay all taxes assessed on the property. The next paragraph requires the tenant to "reimburse the landlord for the amount of (i) any real estate property tax assessed on the Premises if the premises are separately assessed, or (ii) Tenant's pro-rata-share of real property taxes assessed on the tax parcel on which the Premises are located." D-2 ¶ 7.2. Claudia I and Spring Hill dispute whether the Business Privilege Tax is appropriately passed through to tenants as a "Real Estate Tax." Claudia I argues that the business privilege tax is a tax on the rent Spring Hill collects, rather than a tax on the real estate. Spring Hill counters that it charges Business Privilege Tax consistently to all its tenants. Mr. Orloski, Spring Hill's President, testified, "The business privilege tax is a tax on the leases and it's a tax against the property. It's common that that's considered a tax on the property." Testimony of Mr. Orloski, July 22, 111:11–13.

The language of the lease is ambiguous; the lease does not define what specific taxes are included in the term "real estate property tax." Therefore I look to the parties' conduct to discern their understanding of the contract's meaning. Restatement (Second) of Contracts § 202, "Rules in Aid of Interpretation"; *Pa. Eng'g Corp.*, 500 Pa. at 612, 459 A.2d at 332 ("course of performance is always relevant in interpreting a writing"). For instance, in *Solomon v. U.S. Healthcare Systems of Pennsylvania, Inc.*, 797 A.2d 346, 350 (Pa. Super. Ct. 2002), a Pennsylvania Superior Court found that a contract imposed no particular deadlines for payment on parties because "during the parties' fifteen year relationship, no specific time period for payment ever developed, nor was interest ever paid on the claims." The court reasoned, "Certainly the parties' longstanding course of performance was relevant to a determination of whether the parties intended to impose such an obligation." *Id.*

In this case, Spring Hill charged the Business Privilege Tax as CAM to Claudia I multiple times over the years. *See, e.g.*, Exhibits D-24 and D-25. An accountant performing an audit for Claudia I sent Spring Hill a letter challenging the inclusion of the 2008 Business Privilege Tax, but not the 2009 Business Privilege Tax, on the 2009 CAM reconciliation. Exhibit D-4. In 2005 Dunkin' challenged Spring Hill's inclusion of the Business Privilege Tax in CAM charges to the tenant at that time. Exhibit D-22. Mr. Marotta complained to Dunkin' at some point after he took over the store about the charge, and Dunkin' told him to pay. Testimony of Mr. Marotta, July 21, 61:2–14. The evidence of the parties' conduct leans at least slightly in Spring Hill's direction. It appears that for years Dunkin', Claudia I's predecessor, and Claudia I—sometimes under protest—paid the tax that Spring Hill believed was due to it under the lease. This suggests to me that Dunkin' and Claudia I acquiesced, to a certain degree, to Spring Hill's understanding of the contract and performed according to that understanding. On this limited record, I cannot say for

certain that a 'business privilege tax' is always a species of 'real estate tax' that a landlord will normally charge to tenants, but I must conclude from the lack of evidence before me that Claudia I has not proven its claim that Spring Hill breached its contract by charging the fee.

Third, Claudia I claims Spring Hill improperly charged it to repair a door. Claudia I's Proposed Findings of Fact ¶¶ 226–230. The Prime Lease assigns responsibility for fixing doors to Spring Hill. Exhibit D-2 ¶ 8.2. It assigns the tenant the obligation to pay for repairs to plate glass. Exhibit D-2 ¶ 8.1. How then to handle a door *made* of plate glass? The evidence shows that the repairs required were made to the plate glass of the door, rather than the frame or mechanism. Testimony of Mr. Orloski, July 22, 100:17–25. Furthermore, according to Defendant's Exhibit 4, a company called "Alderfer Glass" made the repairs at issue. Because the repairs were made to plate glass, I conclude the lease assigned the cost to Claudia I. *Gustine Uniontown Assoc., Ltd. ex rel. Gustine Uniontown, Inc. v. Anthony Crane Rental, Inc.*, 892 A.2d 830, 837 (Pa. Super. Ct. 2006) ("The intent of the parties to a written contract is ascertained from that writing, the contractual terms are ascribed their ordinary meaning, and where the language is unambiguous, intent is gleaned from the language.").

Fourth, Claudia I claims Spring Hill improperly charged Claudia I for roof repairs. Claudia I's Proposed Findings of Fact ¶¶ 233–240. The Prime Lease allowed Spring Hill to pass costs for minor roof repairs to tenants as CAM, but assigned Spring Hill responsibility for major roof repairs. Mr. Marotta testified that Spring Hill was making too many minor roof repairs; he suspected that Spring Hill was making minor repairs that should have been accomplished with a major repair that Spring Hill would have to cover. Testimony of Mr. Marotta, July 21, 134:21–135:4. Mr. Orloski countered that a major repair would involve replacing a section of roof, and

minor repairs would include activities such as painting or patching holes and would be common CAM expenses. Testimony of Mr. Orloski, July 22, 132:17–133:9.

Once again, Claudia I has not carried its burden of proof to establish this breach of the contract. The question of whether the roof repairs were properly done depends less on the meaning of the contract than on whether Spring Hill abused its ability to control whether it or its tenants paid for repairs. *See* Restatement (Second) of Contracts § 205, comment d (Bad faith performance includes "evasion of the spirit of a bargain, lack of diligence and slacking off, willful rendering of imperfect performance abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance."). Mr. Orloski offered convincing testimony that he believed Spring Hill's roof repairs were for normal maintenance, and not a staged replacement of the roof. Claudia I did not offer convincing evidence that either (1) roof replacements, rather than repairs, were necessary or (2) something less than roof replacements should have been considered 'major repairs.' Therefore this claim is denied.

To summarize, with respect to Claudia I's counterclaims alleging breach of the lease and sublease against Dunkin' and Spring Gill, I find that Claudia I has not carried its burden of proof as to any of its theories of liability.

2. COUNT V: Breach of Franchise Agreement against Dunkin'

I find in favor of Dunkin. Pennsylvania law requires franchisors to act in "good faith and in a commercially reasonable manner" towards franchisees. *Atl. Richfield Co. v. Razumic*, 480 Pa. at 381, 390 A.2d at 742. The franchisor can violate this responsibility if it engages in, for example, "abuse of power to specify terms" of parties' relationship. A franchisor must act with good faith and fair dealing, including not abusing its right to define terms. Claudia I alleges that Dunkin' violated its franchise agreement in several respects.

First, Claudia I alleges that Dunkin' breached its obligation by failing to relocate Claudia I's store. Judge Stengel recognized a factual dispute over whether Dunkin' abused its ability to decide where the franchise would be located. Doc. 88, Opinion of February 10, 2014, p. 12. To the consternation of Claudia I, after the 405 Old York Road Store closed, Dunkin' arranged with a new franchisee to open a Dunkin' Donuts shop at the location where Claudia I had wanted to relocate. The new shop does not sell Baskin-Robbins products because, according to Dunkin, it is too small. Testimony of Mr. Zullig, July 21, 17:23–25.

At trial Dunkin' offered two alternative justifications for not relocating Claudia I's store. First, Dunkin' asserts that Claudia I failed to properly request relocation to a specific location. Mr. Sheker, operations director of Dunkin' in Philadelphia, testified that he would have had to approve any relocation request from Mr. Marotta, and he never received such a request. Testimony of Mr. Sheker, July 22, 35:3–36:25. Ms. Turner testified that she had discussed relocation with Mr. Marotta but that he did not propose a specific location. Testimony of Ms. Turner, July 21, 205:13–18. Ed Mack, a construction manager for Dunkin', also testified that he never heard from Mr. Marotta about his desire to relocate to the other location. Testimony of Mr. Mack, July 22, 17:11.  I do not find this testimony totally convincing.

In addition, however, Dunkin' employees testified to a number of reasons that the alternative location was less desirable than the one the defendants occupied. Ms. Turner testified that Dunkin' did not believe Mr. Marotta could afford the costs of relocating, and that relocation would not relieve his operational problems. Testimony of Ms. Turner, July 21, 205:19–24. Ed Mack testified that the alternative location was significantly inferior. Testimony of Mr. Mack, uly, July 22, 6:5–20. According to Mr. Mack, the alternative location was too small to sell Baskin Robbins, was less visible, had less road traffic, and had fewer parking spaces. He

estimated that it would have cost around $270,000 to build out a new Dunkin'. Testimony of Mr. Mack, July 22, 8:14–16. In fact, the new location has *not* performed well. Exhibit P-13.

Claudia I argues that the opening of a Dunkin' Donuts at the alternative location after the preliminary injunction closed its own store demonstrates Dunkin's belief that the alternative location was viable. Mr. Sheker persuasively countered at trial that remaining at 505 Old York Road was impossible because the location was left in a poor state, was tied up with tax liens, and Spring Hill was demanding a release from Dunkin'. Testimony of Mr. Sheker, July 22, 37:2–14. The relocation was "making the best out of a bad situation. We were more or less forced, if we wanted to stay in that trade area." Testimony of Mr. Sheker, July 22, 36:21–25.

I am satisfied that Dunkin' did not abuse its rights to control Claudia I's location. It made an effort to lower the rent, and given the limitations of 405 Old York Road, Dunkin' had adequate reasons not to grant the relocation. In that regard, Dunkin' does not need to have been correct about the cost or effects of relocation. Mr. Marotta might be correct that he would have been more successful at the alternative location. But a franchisor is not the guarantor of its franchisee's success. It is enough that Dunkin' acted reasonably towards Claudia I. As to relocation, I conclude that Claudia I has not carried its burden to prove that Dunkin' violated its duty of good faith and fair dealing.

Claudia I's second theory of Dunkin's breach is that Dunkin' breached its obligations by refusing to help Claudia I reduce its operating expenses. Claudia I's Proposed Findings of Fact ¶¶ 61–79. Claudia I cites evidence showing that Dunkin' recognized financial problems at the Jenkintown store, but neither relocated the store nor assisted Claudia I in reducing CAM costs. To this extent this argument simply repeats the claim that Dunkin' should have relocated Claudia I, I reject it for the reasons stated above. Furthermore, Dunkin' did in fact negotiate a lower rent

for Claudia I, but Claudia I rejected the offer. Finally, Dunkin' dispatched personnel to offer advice on operations, and I find Ms. Turner to be a credible witness. Assuming, without deciding, that Dunkin' had an affirmative obligation to help Claudia I manage its expenses, I am satisfied that Dunkin' acted reasonably in satisfying that obligation.

Claudia I also makes arguments that Dunkin' violated its duty of good faith and fair dealing by renewing the Prime Lease between Dunkin' and Spring Hill and by offering an amendment to the sublease to Claudia I that required Claudia I to release any claims against Spring Hill. Claudia I's Proposed Findings of Fact ¶¶ 59–60. The record reflects that Spring Hill insisted on such a clause as consideration for renegotiating the lease. Testimony of Mr. Orloski, July 22, 116:4–22. The parties here were business enterprises negotiating at arm's length. A party's attempt to limit its liability in return for other concessions does not establish bad faith or unfair dealing.

In summary, with respect to Claudia I's counterclaim that Dunkin' breached its contract with Claudia I, I find Claudia I has failed to prove its case.

3. COUNT VII: Tortious Interference with Franchise agreement/Dunkin' Lease against Spring Hill Only.

Claudia I argues that "Spring Hill's intentional refusal to honor its obligations under the Prime Lease has tortiously interfered with Claudia I's relationship with Dunkin'." Claudia I's Proposed Findings of Fact ¶ 133.

To succeed on a claim for tortious interference, a plaintiff must prove:

(1) the existence of a contractual, or prospective contractual relation between the complainant and a third party;

(2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring;

(3) the absence of privilege or justification on the part of the defendant; and

(4) the occasioning of actual legal damage as a result of the defendant's conduct.

*Reading Radio, Inc. v. Fink*, 833 A.2d 199, 211 (Pa. Super. Ct. 2003). Pennsylvania courts look to several aspects of a party's conduct when evaluating a claim of interference with contract:

1) the nature of the actor's conduct; 2) the actor's motive; 3) the interests of the other with which the actor's conduct interferes; 4) the interests sought to be advanced by the actor; 5) the proximity or remoteness of the actor's conduct to interference, and 6) the relationship between the parties."

*Strickland v. Univ. of Scranton*, 700 A.2d 979, 985 (Pa. Super. Ct. 1997).

The sublease and franchise agreement between Dunkin' and Claudia I satisfy the first element. As to the second element, I do not find enough credible evidence in the record to find that Spring Hill specifically intended to interfere with Claudia I's contract. At worst, Spring Hill was lax in the maintenance of its own property and charged extra fees to Claudia I. This alleged conduct might be consistent with a poor landlord, but does not constitute intentional interference with its own tenants. Spring Hill had no motive that I can discern to sow dissent between its tenant and subtenant. Spring Hill had nothing to gain and risked creating the situation that now exists, in which Spring Hill is entangled in litigation and its property sits empty. Considering Spring Hill's conduct and its incentives, I cannot find that it tortiously interfered with Claudia I's contract with Dunkin'. *See Strickland*, 700 A.2d at 985 (finding there was no genuine issue of material fact as to a party's intent to interfere with a contract). Therefore this claim is denied.

**Crossclaims between Dunkin' and Spring Hill**

Because Claudia I has not prevailed, I do not need to consider to what extent Dunkin' and Spring Hill must indemnify each other for damages flowing from Claudia I's substantive claims. As to indemnification for attorneys' fees, to the extent that Dunkin' and Spring Hill wish to

pursue such claims, Dunkin' and Spring Hill should file supplemental briefs explaining their respective positions.

**Conclusion**

The total judgment against Claudia I for its breach of its agreements with Dunkin' is $212,724.57.


_____/s/ Gerald Austin McHugh
United States District Court Judge